Madden, Judge,
delivered the opinion of the court:
The plaintiff, on December 15,1942, made a contract with the Government, which acted through the War Department’s Corps of Engineers, to construct the U. S. Army General Hospital at Utica, New York. There were to be 122 buildings, with connecting enclosed walkways, and the contractor was to install all utilities, place the surfacing on the roads, and do the finished grading and seeding of the grounds. The Government was to furnish various items of material which would be incorporated in the structures. Other items, including lumber and nails, were to be obtained by the plaintiff from sources and through allocations to be designated by the Government.
The work was divided into four groups, one group to be completed by each of the following dates: March 1, March 15, April 15, and May 15, 1948. Especially in view of the extreme cold weather which prevails in the area, the completion of the work within the specified times was hardly to be expected, though it was not impossible.
The whole project had been thought up in a hurry, in the fall of 1942. The site selected was a sloping hillside, with a drop of some 50 feet in elevation in the 2,000 feet of its north to south dimension. The plan called for terracing the hillside and for placing roads and buildings on a *649 succession of levels. In order to get the work started, a contract for the grading for the roads and terraces, the construction of the roads, except for their final smooth surfacing, and the construction of the drains, was let to the Winkleman Company on November 4, 1942, which was before the plans for the buildings had been completed. Winkleman’s work was to be completed by December 5, subject to the usual provisions about excusable delays. Winkleman was delayed by wet weather. Priority was given to the construction of roads, which involved the making of cuts and fills. The fills were placed on wet ground, the earth placed in the fills was wet, and there were drenching rains while the work was being done. The ground froze at night and some frozen ground was placed in the fills. A 12-inch course of bank gravel was placed by Winkleman on the roads, but, as we have said, the final smooth surface of the roads was to be placed by the building contractor after the completion of the buildings.
When bids for the construction of the hospital were invited, the plaintiff’s representatives visited the site, on December 10 and 11,1942, and observed but paid no particular attention to the road and grading work which was in progress.
Both parties assumed that the plaintiff would use the roads, as constructed by Winkleman, as haul roads in connection with its building operations.
On December 21, 1942, the plaintiff was given notice to proceed. By that time Winkleman had completed the grading of 41 building sites, and was still working on the roads and the grading, and continued to work through January and until February 27, 1943, when that work was suspended because of the cold weather. By the time of the suspension, all the main access roads and most of the drainage ditches were built.
During January and February the ground froze so hard that trucks could travel anywhere on it. Holes for foundation piers for the buildings had to be dug, but the digging was difficult and expensive because of the frozen ground and the plaintiff did not place as many piers as it might have. The same was true as to the digging of trenches for the plac *650 ing of pipes for tbe utilities. The plaintiff anticipated, probably with reason, that much of the work would not in any event be completed before spring, and it therefore sought to avoid the expense of digging in the frozen ground. There had also been delays in the furnishing of materials to be furnished by the Government, or to be obtained upon Government allocation.
By March 10, the plaintiff was getting ready for the big push toward getting the job forward. Heavily loaded trucks were moving lumber on to the site in great volume. Surveys had been made for the utility trenches and equipment to dig them was available. On March 11, the spring thaw began, some weeks earlier than usual. There was rain, off and on for several days. The heavy hauling continued, and within a week or ten days after March 11, the whole road system disintegrated. Trucks sank in the mire to the cab. Tractors, sent to pull out the trucks, had to be pulled out by caterpillars. What happened to the roads was that, as the frost came out of the ground, the moisture, because of the depth to which the ground was frozen, could not drain downward, hence it was carried toward the surface by capillary action. It thus soaked the soil under the 12-inch gravel course of the roads, and the loads crushed the gravel into the mud. The fact that the earth bases under the gravel had been wet and frozen when the gravel was placed, the fact that the drainage ditches at the sides of the road were not adequate, and had in some instances been obstructed by the plaintiff, and the unusual capillarity of the soil, all made their contribution to the collapse of the road system. The only thing that would have saved the roads would have been to keep loaded vehicles off them for several weeks. Neither party even seriously thought of doing that. Both were intent on getting the work forward. The contracting officer took the position that it was the plaintiff’s responsibility to keep the roads passable, or to get its work done somehow. The plaintiff’s position was that the failure of the roads was a breach of contract by the Government, for which the plaintiff would make a claim.
At very great extra expense, by unloading, hand handling, hauling in brickbats, slag, and cinders, miring down and *651 digging out, placing equipment on pontoons, the work proceeded, greatly delayed, of course. After the frost was out of the ground the month of April was wet and cloudy, and May and June were rainy. The site did not dry out enough for grading operations to be resumed by Winkleman until July.
On April 19, 1948, the plaintiff notified the Government that a formal claim would be filed. It filed such a claim on May 24. In the statement the plaintiff said, among other things, that it had “encountered unforeseen conditions beyond its control and not due to its fault or negligence.” It requested the contracting officer to make findings of fact and presented 122 proposed findings of fact in separate, numbered paragraphs.
On July 5, 1943, the plaintiff filed a supplementary statement. This and the earlier statement, considered together, gave adequate notice to the contracting officer that the plaintiff was asking for compensation for the expense incurred because the plaintiff had “encountered unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.” Article 4 of the contract provided for additional compensation in such a situation.
On October 19, 1943, the contracting officer denied the plaintiff’s claim. He did not make findings of fact with regard to the plaintiff’s claim that it had encountered unknown conditions, and apparently gave no consideration to that claim. On November 16, 1943, the plaintiff appealed the decision of the contracting officer to the Secretary of War, stating that the appeal was made pursuant to Article 15 of the contract. That article provided that the contracting officer was authorized to decide all disputes concerning questions of fact, subject to a right in the contractor to appeal to the Secretary of War, whose decision, or that of his representative designated by him to hear the appeal, should be final.
On December 13, 1945, the War Department Board of Contract Appeals, which had been designated by the Secretary of War to hear such appeals, made its decision. It *652 denied tbe first three of the plaintiff’s claims and dismissed the other seven. Its dismissal was on the ground that the last seven claims were claims for unliquidated damages based upon an alleged breach of contract, the failure of the road bases and drains, and that Article 15 did not authorize the contracting officer or the board to decide claims for unliqui-dated damages for breach of contract.
The Board, in its opinion, in taking jurisdiction of the first three claims, said that they were claims on account of changes, within Article 3 of the contract, or for changed conditions, within Article 4. Article 4, whose title is “Changed Conditions” is the article relating to unknown and unanticipated conditions. The Board said that “the acts of the appellant, in substantial part, caused the almost total failure of the roads and drains thus necessitating the * * * work” for which the claim was made. In its “decision” which followed its factual summary, the Board said :
It cannot be said that the work forming the basis for the instant claims was necessitated by or the result of “Changes”, “Changed Conditions”, or “Extras” within the purview of the contractual provisions relating to these subjects.
Public Law 856, approved May 11, 1954, 68 Stat. 81, provides as follows:
Finality Clauses in Government Contracts
An Act
To permit review of decisions of the heads of departments or their representatives or boards involving questions arising under Government contracts.
Seo. 1. Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That no provision of any contract entered into by the United States, relating to the finality or conclusiveness of any decision of the head of any department or agency or his duly authorized representative or board in a dispute involving a question arising under such contract, shall be pleaded in any suit now filed or to be filed as limiting judicial review of any such decision to cases where fraud by such official or his said representative or board is alleged: Provided, however, *653 That any such decision shall be final and conclusive unless the same is fraudulent or capricious or arbitrary or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
Seo. 2. No Government contract shall contain a provision making final on a question of law the decision of any administrative official, representative or board.
The instant suit, because it was pending at the time of the enactment of Public Law 356, is governed by that statute.
As we have said, the contracting officer, in denying the plaintiff’s claim, made no finding about or mention of unknown or unforeseeable conditions though the plaintiff had, in its written statement of claim, asserted that it had suffered damage as a consequence of such conditions.
We think it is beyond dispute that conditions unforeseen by the parties to the contract were encountered. If the Government foresaw, and the plaintiff should have foreseen, that materials could not be hauled over the roads on the site of the contract during the long period of the spring thaw in the cold climate of Utica, the completion dates fixed in the plaintiff’s contract, for work to be commenced on December 15, 1942, were wholly beyond reason. Those dates, for the four divisions of the work, were March 1, March 15, April 15 and May 15, 1943. As it turned out, after the beginning of the spring thaw on March 11, the site did not dry out enough to permit grading operations to be resumed until July. None of the four divisions of work was completed before September.
The contracting officer’s decision, and the Government’s present position are based largely upon the assumption that it was the plaintiff’s responsibility to provide its own roads; that its being permitted to use the roads which the Government had caused to be built was merely an accommodation. But the bids for the plaintiff’s contract were not opened until December 14, 1942. It is unthinkable that the plaintiff was expected to build, within the limited site, a network of construction roads duplicating those that were then being built by another contractor, and make those temporary construction roads so much better than the permanent roads that they would carry heavy traffic during the spring thaw. That it *654 was expected that building construction work would be suspended during tlie spring thaw has not been urged and cannot be urged. The time limits for completion show that the plaintiff never thought it had the right to suspend the work, and the contracting officer was constantly pressing for more rapid progress.
We have found that the disintegration of the roads might not have been as complete, if the plaintiff had conducted its operations differently. We have taken that fact into consideration in assessing the damage suffered by the plaintiff. But we have found that the roads, as designed and built, were, in the unforeseen conditions that actually developed, wholly inadequate for the purpose for which they were expected to be used by the plaintiff.
The Board of Contract Appeals of the War Department, to which the plaintiff appealed from the adverse decision of the contracting officer, also made no finding and no statement in its opinion as to the existence of unforeseen conditions, except the following:
It cannot be said that the work forming the basis of the instant claims was necessitated by or the result of “Changes”, “Changed Conditions” or “Extras” within the purview of the contractual provisions relating to these subjects.
The Board devoted its discussion to the problem of whether the Government had been negligent in not building better roads, and whether it had warranted that the roads which it furnished would be usable. Those matters are beside the point when a claim of unforeseen conditions is made. The contract provided that if there were unforeseen conditions, an equitable adjustment would be made to compensate for the expense resulting therefrom. The liability is contractual, and does not depend upon negligence, or a culpable failure to perform an agreement.
As to changed, or unforeseen conditions, then, we have nothing from the contracting officer, and nothing from the Board except its ipse dixit that there weren’t any changed conditions. We think the Board’s failure to discuss the question was largely due to what we have found to be a misinterpretation of the contract, with reference to the expectation *655 of the parties that the plaintiff would use the existing roads.
The opinion of the Board shows the first three items of the plaintiff’s claim as follows (finding 45) :
Item I. Beconstruction and stabilization of road bases.
Item II. Beconstruction and maintenance of drainage ditches and culverts.
Item III. Begrading terraces and slopes.
The Board said (finding 46):
The Board is of the opinion that it was appellant’s responsibility, under the contract * * * to do the work embraced in Items I, II, and III. * * * the evidence justifies the conclusion that the acts of appellant, in substantial part, caused the almost total failure of the roads and drains, thus necessitating the large amount of such work.
We think the Board misconstrued the contract in concluding that it was the plaintiff’s responsibility to reconstruct and stabilize the road bases at its own expense, no matter how unforeseeable their failure may have been. As we have said, the parties contemplated the use of the road bases for construction roads, and did not contemplate their failure if they were so used, with a reasonable amount of maintenance. The parties did not contemplate that, for the long period of the spring thaw, which came some twenty days earlier than the Government expected, nothing but light loads should traverse the roads. The Board’s misconstruction of the contract is shown by its statement, in this connection, that the plaintiff was under a duty to provide its own construction roads. See finding 46.
The Board says that the plaintiff’s own acts, in substantial part, caused the failure of the roads. We, too, have found that the plaintiff could have by more careful maintenance of the roads, minimized its damages. But that fact did not authorize the Board to place upon the plaintiff’s shoulders all the rest of the damage which could not have been avoided except by closing down the project.
It may well be that the failure of the Board to give adequate consideration to the question of unforeseen conditions was due to the fact that the Government’s attorney, on the one *656 hand, was urging that the plaintiff was using the existing roads only by the grace of the Government, and with complete responsibility to maintain and restore them, while the plaintiff was urging that the Government had impliedly guaranteed to supply a usable system of roads. No fault is imputed to the Board in failing to see that the real problem, under the contract, was one not urged by the parties. It was whether the disastrous failure of the roads was an unforeseen event from the expense of which the contractor was entitled to be relieved by the application of Article IV. The plaintiff’s failure to analyze with greater nicety the appropriate theory for its claim should not have the effect of a forfeiture of its rights. Its assertion that the Government had warranted the usability of the roads was not essentially different, when coupled with its assertion that unforeseen conditions had been encountered, from a claim based solely on the unforeseen conditions. The measure of its compensation would have been the same on either basis. The Government’s attorney before the Board, and the Board itself, would have been more familiar with the plaintiff’s complex, Govermnent-written contract than plaintiff’s counsel was.
The interpretation of the contract, which was the key to the Board’s decision, was not a question of fact on which the Board’s decision was final, under the contract. McWilliams Dredging Company v. United States, 118 U. S. 1, 16. The Board itself is of that opinion as the references in the McWilliams case show. Public Law 356, hereinbefore quoted, in its Section 2 forbids the insertion in Government contracts of a provision making final an administrative decision of a question of law. Congress undoubtedly used the expression “question of law” with the meaning that was universally attached to it, that is, that it included a question as to the interpretation of a contract.
On the whole, on this phase of the case, we think that, so far as a question of fact was involved, there was no substantial evidence that the parties foresaw that a considerable part of this big construction job would have to be performed in a quagmire. But the real foundation of the Board’s decision was its erroneous conclusion as to the interpretation of the contract. Pursuant to the provisions of the contract and *657 of Public Law 356, we have the question for decision. Our decision is that the plaintiff is entitled to recover the expenditures reasonably and naturally flowing from its encounter with these unforeseen conditions. We have found that those expenses amounted to $310,000.
After it had filed its claim with the contracting officer, the plaintiff continued with its work. On May 18, 1943, it requested extensions of time, and on June 7, the contracting officer extended the time for completion of all four groups of the plaintiff’s work to June 30, on account of unusual weather, delays in delivery of Government-allocated and Government-furnished materials, and a critical shortage of labor. At the time of the granting of this extension, the contracting officer did not expect that the work on the buildings, which comprised Groups 1, 2, and 3 of the plaintiff’s work could be finished by June 30, and knew that the Group 4 work, road surfacing and final grading, could not be done until the building work was completed. The June 30 date was apparently set with regard to the close of the fiscal year on that day.
Not until the end of June was the ground dry enough for the work of placing topsoil and seeding, and road surfacing. Winkleman, the contractor for rough grading, had been delayed as was the plaintiff, and some of that work was still not done when July 1 came. The plaintiff and Winkleman got in each other’s way. There were heavy rains in July and August, and because of faulty setting of grades by the Government’s agents, water ponded under some of the buildings and buckled the floors. In between rains, the dust caused by the work on the site became a nuisance.
In the Army’s chain of command in the area, the Commanding General of the Second Service Command was at the top. At the hospital itself the senior medical officer was in command, and had authority over the officers of the Corps of Engineers who were building the hospital. The senior medical officer had been in Utica during the cold of the winter, the mud of the spring, and the dust of the summer. He was under pressure from above to get the hospital completed. During June and July, medical supplies and hospital equipment were moved into some of the buildings. *658 Early in August the first trainload of wounded soldiers arrived at the hospital. In that month the question of further extensions of time for completion of the plaintiff’s work came up. Under the Army chain of command, the contracting officer was required either to obtain the approval of the commanding officer of any extension which he proposed to make, or to submit the recommended extension to higher authority. The .contracting officer requested the approval of the comamnding officer, the senior medical officer, for an extension of the plaintiff’s time for the completion of the Group 4 work, which was the road and final grading work.
The commanding officer was disgusted with the situation, thought the drainage arrangements were inadequate, and demanded that the Corps of Engineers terminate the plaintiff’s right to proceed, take over the work themselves or get someone else to do it, and, in so doing, overhaul and amplify the drainage system. Plans were drawn accordingly, which increased the capacity of the drainage system, added to it culverts, catch basins, and riprap, and called for some additional roads. Under these plans the continuation of work by Winkleman under the revised plans, and by the plaintiff under its original plans, would have resulted in extensive duplications and additional costs. The contracting officer decided that one contractor should perform all the work under the revised plans, and also all the uncompleted work of both the plaintiff and Winkleman under the original plans, so far as that work had not been affected by the revised plans. He decided to terminate the plaintiff’s contract as to the Group 4 work, and give all the work described above to Winkleman.
The plaintiff was notified of this action on August 21, 1943. It was told to make a survey of the work it had done on Group 4 items and that it would be paid for that work. At that time the contracting officer intended to terminate the plaintiff’s Group 4 work for the convenience of the Government, and had no thought of charging the plaintiff for the excess cost of getting the work done by someone else. However, the contracting officer was advised by Government lawyers that if he terminated the plaintiff’s contract and had another contractor complete the work, and did not back-charge the plaintiff with the excess cost of the work, legal *659 complications would result. The contracting officer for that reason, on August 28, 1943, formally notified the plaintiff that its Group 4 work was terminated under Article 9 of the contract because of delay by the plaintiff in the progress of the work.
The Group 4 work was completed in due course by Winkle-man, at unit costs which were reasonable but were greatly in excess of those specified in the plaintiff’s contract, and the plaintiff was charged with the excess.
On September 12, 1943, the plaintiff requested extensions of time for all groups of its work. As to Group 4, it asked for an extension to August 24, the day on which it was notified to stop that work. If that extension had been granted, it would seem to have meant that the plaintiff was not in default when the work was terminated on the stated ground that it was in default. The contracting officer, on February 8, 1944, extended the time for the Group 4 work, which had formerly been extended to June 30, only to July 30. As to the plaintiff’s building operations, its time was extended to the actual completion dates in September and October.
On March 8, 1944, the plaintiff appealed from the contracting officer’s decision as to extensions of time to the Secretary of War. On May 10,1944, the plaintiff protested to the contracting officer his action in backcharging to the plaintiff the excess costs of completion. On June 17, the contracting officer denied the protest. On July 15, the plaintiff appealed this decision to the Secretary of War. After each of the foregoing appeals the contracting officer made detailed findings of fact which were in the nature of the brief of an advocate opposing the plaintiff’s appeal. On December 14,1945, the War Department Board of Contract Appeals denied the plaintiff’s appeals.
The action of the contracting officer on these two problems was vulnerable in two respects. As to the denial of the extension of time, he did not himself decide the question. He had intended to grant the extension, but abdicated his contractual responsibility to the commanding general. His action in terminating the Group 4 work for delay did not represent his judgment as to the merits of the case, but was *660 a device to satisfy what lawyers told him were, or probably were, the legal requirements of the situation.
Article 15 of the contract provided that disputes, arising under the contract, concerning questions of fact, should be decided by the contracting officer, with the right in the contractor to appeal to the Secretary of War. Whatever may have been the chain of command in the Army’s organization, the contract entitled the plaintiff to a decision by the contracting officer, and not by him or a superior who chose to supersede him for the occasion. The commanding officer, who made the decision which was signed by the contracting officer, reached his conclusion largely for the reason that the drainage system as originally designed was inadequate. That, of course, was not the responsibility or the fault of the plaintiff.
Except for the redesigning of the work by the Government, which created overlapping and confusion of the plaintiff’s work with that of Winkleman, there was no reason why plaintiff was not entitled to an extension of its Group 4 work commensurate with the extensions which it was given on its other three groups of work. Those extensions were, presumably, given for the same reasons as the earlier and admittedly inadequate extensions of all four groups of work, viz, unusual weather, delays in delivery of Government-allocated and Government-furnished materials, and a critical shortage of labor. Besides, it was impossible to complete the Group 4 work, road surfacing and final grading, until the building construction covered by the other groups of work was completed.
When it was decided to redesign the drainage system, the Government had a right to give the additional work to whom it pleased, and it decided to give it to Winkleman. Having given it to Winkleman, it decided, reasonably enough, that to have two contractors working simultaneously on grading, often at the same places, would be confusing and expensive, and that it would be to the convenience of the Government to terminate the plaintiff’s Group 4 work. The Government had the right to do that, paying the plaintiff for what it had done. The contracting officer decided to handle the matter in that way and so orally advised the plaintiff. Then the Government’s lawyers advised the contracting officer that *661 unless be terminated the plaintiff’s contract for the plaintiff’s fault, thereby laying the basis for charging the plaintiff with the excess costs of having the work completed by another contractor, legal complications might ensue. For that reason the contracting officer charged the plaintiff with unjustified delay, and placed the termination on that ground.
The contract required the contracting officer’s decision on questions of fact. It did not contemplate that his decision would be shaped by ulterior motives, looking toward the possible or probable legal consequences of that decision.
The purported decision of the contracting officer denying the plaintiff an extension of time, and terminating the contract for the plaintiff’s fault, was a nullity. As to one aspect, it was not his decision, and as to the other, it was a decision arrived at for an irrelevant reason. Yet his decision went, on appeal, to the Board of Contract Appeals, clothed, presumably, with some presumption of correctness, because of his competence and his intimate knowledge of the facts. The interposition of the commanding officer and the Government lawyers into the situation, which nullified the contracting officer’s decision, were, so far as appears, not known to the plaintiff or to the Board. They were disclosed upon the trial of the case in this court. Whatever justification there may have been for the Board’s decision upon the basis of the facts known to it, we feel certain that if it had had the evidence which we have, and which was in the possession of the Government and unknown to the plaintiff, it would have remanded the case to the contracting officer for a decision properly arrived at. That decision, presumably, would have been the one that he intended to make before he was overruled by the commanding officer and influenced by the lawyers.
The plaintiff’s Group 4 work was, in fact, terminated for the convenience of the Government. The Government had, therefore, no right under the contract to charge the plaintiff with the excess costs of having it completed by another contractor. The plaintiff is entitled to recover $67,079.29 on the second item of its claim. Since it is entitled to $310,000 on the first item of its claim, it may have a judgment for a total amount of $377,079.29.
It is so ordered.
*662 Laeamokjd, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner W. Ney Evans, and the briefs and argument of counsel, makes findings of fact as follows:
1. During the fall of 1942, the War Department, acting through the Army’s Corps of Engineers, ordered the construction of a hospital near Utica, New York. The buildings were to be of frame construction, and the project was to be completed in the spring of 1943. The hospital was intended to receive wounded soldiers.
The site selected was a hillside sloping some 2,000 feet from north to south with a drop of 50 feet or more. It appeared to present ideal conditions for natural drainage of the surface. Running along the northern boundary of the site, some 400 feet north of the area in which the construction was to be placed, was a two-lane concrete highway known as Burrstone Load.
The plan called for terracing the hillside and for placing access roads and buildings on and along the succession of levels.
The grading, road construction, and drainage work were-separated from the building construction, in an effort to save time. Plans for the roads, grading, and drainage were com-'' pleted and a contract let while the building plans were still r on the drawing boards.
2. The hospital site occupied an area of approximately 85 acres. The plans called for roads around the perimeter of the construction area, and necessary intersecting and tributary roads and parking areas. Three of the perimeter roads, designated as Roads A (on the west), J (on the east), and L (on the north), were to be 22 feet wide. These were Class A roads. Road N (on the south), Road M (running east and west about one-third of the way up the hill from Road N), and various tributary roads were to be 16 feet wide. These were Class B roads. The only difference between Class A and Class B roads was in the width.
*663 Approximately half of the roads were to be in cut and the other half on fill. For roads placed in cut, the design called for excavating to the line of the sub-base, compacting the surface with a sheepsfoot roller, and then placing 12 inches of run-of-bank gravel, in two layers of six inches, each layer to be rolled for full compaction. For roads placed on fill, the design called for the stripping of the topsoil, the placing of fill in six-inch layers of soil of optimum moisture content, each layer to be compacted with a sheepsfoot roller. When the proper elevation had been reached, a 12-inch course of run-of-bank gravel was to be placed in two layers, with each layer rolled. In both cases shoulders were to be installed outside the gravel course, the shoulders to be made of compacted material of the same type as the subbase, with french drains at intervals of 100 feet, staggered on opposite sides so that drains in opposite shoulders would be 50 feet apart.
The construction of roads as described in the preceding paragraph was required by the grading contract. The construction contract called for reshaping the roads as needed and for the installation of a wearing surface of impervious bituminous material after the building construction had been completed.
3. The design of the drainage system called for open ditches of capacity sufficient to carry from the site (when completed: 25 percent covered — surfaced or roofed — and 75 percent turfed) the highest intensity of rainfall predicated on a five-year period.
East-west ditches were to intercept the water as it came down the slopes and carry it to the two marginal roads (A and J), whence it would flow south through culverts where needed and discharge off the site. There were to be four culverts on the east and four on the west.
The ditches along the sides of the roads were to be cut at least one foot into natural or undisturbed ground, were to have a bottom width of two feet, a minimum depth of two feet, and side slopes of two-on-one.
Since the plan called for seeding the slopes and embankments, so that sod would hold them in place, no aprons, head-walls, or riprap were provided at culverts, and no riprap at the joinders of ditches. Most of the ditches joined at *664 right angles. No catch basins were provided at joints, intersections, or culverts. The north-south ditches were designed on a two percent grade.
4. On October 26,1942, the Army issued an invitation for bids for the grading, drainage, and road work. On November 4, 1942, a contract was made with D. W. Winkleman Company (hereinafter referred to as Winkleman), who undertook to “furnish all materials, labor and equipment, and perform all work required for grading and draining the site and constructing gravel roads and parking areas * * * in strict accordance with the specifications * * This contract is sometimes hereinafter referred to as the grading contract. It provided that the work should be completed within 30 calendar days after November 5, 1942, but contained the usual provisions relating to delays due to causes beyond the control of the contractor, including unusually severe weather. The meteorological data contained in the invitation for bids showed that, over a period of 75 years, the “average mean” temperature for November at Utica was 36.8 degrees Fahrenheit, and the average precipitation for November (over a period of 115 years) was 3.4 inches.
Winkleman began work promptly, but delays were soon encountered owing to wet weather. The precipitation during November 1942 was above normal.
5. Winkleman gave priority to the construction of road bases. Concentration on this work at the outset was essential in order to get as much of it done as possible before the hard freezing began.
The topsoil was stripped and stockpiled. The road area was then either cut or filled to the proper elevation. Most of the earth fill was taken from borrow pits. When The ground was very wet, fill material was taken from interior portions of the borrow pit, in order to obtain relatively dry soil to which could be added the optimum moisture content for compaction.
Winkleman’s contract called for the construction of drainage ditches for the roads before the road bases were constructed. In operation, Winkleman constructed the ditches simultaneously with the road bases. Where the road was placed on fill, the placement of the fill comprised one side of *665 the ditch, and the remainder was completed later. Where the road was in cut, a single cut for the full width of the road and ditch was made to the level of the road subbase, and the ditches were then dug to their proper depth.
All except one of the culverts were placed on undisturbed ground.
6. In late November and early December temperatures were below freezing at night, some of the time; they were usually above freezing during the day. Hard freezing weather did not arrive until the middle of December 1942. The moisture which fell in November and early December was enough to fairly saturate the soil. Winkleman had to carry on his work as best he could with wet ground. During periods of excessive precipitation road work was suspended. Otherwise it was prosecuted vigorously, with crews working 16 hours per day by mid-December, by which time most of the road fills had been completed. Many of the fills were placed on very wet ground, and the fills themselves, as well as the areas built in cut, were repeatedly drenched. In the absence of completed drainage ditches, there was some pond-ing on the roadsides, causing the absorption of more moisture into the road bases.
By mid-December Winkleman had completed a substantial volume (upward of 75 percent) of his contract, most of it being on the main roads (A, J, L, M, and N) and their ditches. The grading of terraces was not well advanced. Other items uncompleted or not begun included the placing of gravel on the roads, the installation of shoulders and french drains on the main roads, and the grading of parking areas and minor roads.
7. On December 2,1942, the Army issued its invitation for bids for the construction of the hospital. The invitation contained the following provision:
Investigation of Conditions. Bidders are expected to visit the locality of the work and to make their own estimates of the facilities needed, the difficulties attending the execution of the proposed contract, including local conditions, availability of labor, uncertainties of weather, and other contingencies. Bidders are advised to familiarize themselves with the existing terrain and cover of the site by visual inspection. In no case will *666 the Government assume any responsibility whatever for any interpretation, deduction, or conclusion drawn from the examination of the site. At the bidder’s request a representative of the Government will point out the site of the proposed operations. Failure to acquaint himself with all available information concerning these conditions will not relieve the successful bidder of assuming all responsibilities for estimating the difficulties and costs of successfully performing the complete work.
8. On December 10,1942, a representative of plaintiff visited the site. He saw Winkleman’s men at work; observed that the ground was rather wet; noted that the base of the north-south road on the westerly boundary (Road A) was substantially complete; and saw that work was under way on one of the east-west roads. Nothing of unusual interest attracted his attention, and he did not undertake to make detailed observations of the soil or other site conditions, nor did he inquire into the details of the specifications on which Winkleman was working. His primary concern in making the visit was to determine the availability of railroad sidings and public highways which would give access to the construction site.
On December 11, 1942, another representative of plaintiff visited the site. He drove his car over portions of the two road bases and noted that neither road work nor general grading had been completed. He undertook no detailed observations of the soil or other site conditions, and made no inquiry concerning the Winkleman specifications.
Plaintiff’s representatives knew from their observations, and from the invitation for bids, that the undertaking was and would be a wintertime job, for the grading contractor as well as the construction contractor, in an area of severe winter weather.
9. On December 15, 1942, plaintiff submitted its bid for the general construction of the hospital, based on assumed quantities fixed by the Government and at unit prices fixed by plaintiff. The amount of the bid was $2,468,661.78. It was the low bid. The Government’s estimate of the cost of the contract work was $3,371,568.46. There were 11 bids other than plaintiff’s. Six of the 11 bids were lower than the Government estimate, the lowest of the six being in the *667 amount of $3,066,361.00. Of the five bids higher than the Government estimate, the highest was $3,909,757.50. Plaintiff’s bid was 26.77 percent below the Government estimate, 19.49 percent below the bid nest above plaintiff’s, and 28.16 percent below the average of the 11 bids other than its own.
10. Plaintiff is a New York corporation. At the time of bidding it was one of the largest carpentry contractors on the east coast. It had had wide experience in the field of general construction, in building schools, hospitals, housing projects, and cantonments. Because of its concentration on carpentry work, plaintiff had underbid its competitors on some of its other contracts, where carpentry work predominated, by 20 to 30 percent, and had made a profit. Plaintiff’s bid for the contract now in suit was intentionally low. It was based on unit costs experienced by plaintiff in building a similar hospital during the preceding winter, after adjustments for differences between the two projects.
11. In the preparation of its bid plaintiff assumed that it would be permitted to use the road bases being constructed by Winkleman on which to haul materials into the site for distribution thereon. Since it would be plaintiff’s responsibility to reshape the ditches and roads, and to surface the roads after construction was completed, plaintiff included in the bid its estimate of the cost of that work.
12. At the invitation of defendant, after the bids had been opened, a conference was held at the job site between the area engineer and members of his staff, representing defendant, and members of plaintiff’s organization. In calling the conference the area engineer was concerned because plaintiff’s bid was so much lower than the others, and he had misgivings as to plaintiff’s willingness to perform. A general discussion was had of problems which might be encountered. Plaintiff was given opportunity to present questions as to the nature and scope of the work. Indications were made to plaintiff of the areas where grading work had been completed and where construction work could be started immediately. Defendant’s representatives advised plaintiff that Government supplied materials had begun to arrive, and urged plaintiff to put an organization in the *668 field as quickly as possible to receive, check, and store the materials.
13. Following the conference the area engineer communicated with his district office, and a letter of intent and notice bo proceed were sent to plaintiff later in the same day (December 19,1942). The formal, written contract was executed in due course. It was dated December 15,1942, and was identified as Contract No. W 321 Eng. 800. This contract (sometimes hereinafter referred to as the construction contract) is in evidence as plaintiff’s Exhibit No. 1, which is incorporated herein by reference. Material excerpts of the provisions of the contract and specifications are set forth in findings 102 to 124.
14. By the terms of the construction contract plaintiff undertook to “furnish all labor and equipment and furnish * * * materials * * * not * * * furnished by the * * * Government * * * and perform all work required in connection with the construction of buildings, utilities, and road surfacing for the U. S. Army General Hospital at Utica, New York, in strict accordance with the * * * specifications * *
The construction contract called for the erection of 122 buildings with connecting enclosed walkways, the installation of all utilities, road surfacing, and finished grading and seeding.
15. Defendant undertook to furnish various items of materials required for hardware, plumbing, interior electrical work, water distribution system, automatic sprinkler system, steam distribution system, heating plant, cold storage spaces, gasoline station, and other equipment.
In addition to the items to be so supplied, the construction contract required that lumber, nails, and other items be procured through allocations and from sources designated by defendant. Allocated lumber was to be delivered by the vendors in accordance with a schedule to be provided by the contractor. The schedule had to allow 15 to 30 days’ tolerance between requested delivery and actual need.
16. Plaintiff’s work was required to be completed in four groups, as follows:
*669 Group 1. Warehouses, Telephone and Administration Building, by March 1,1943.
Group 2. Barracks and Headquarters, by March 15, Í943.
Group 3. All other buildings and utilities (except roads and grading), by April 15, 1943.
Group 4. Roads and grading, by May 15, 1943.
17. The completion dates so assigned comprised a tight schedule, but not an impossible or unrealistic one. Each of the parties knew, or reasonably should have known, that the schedule was tight, and that unusually severe weather, delays in the delivery of materials or shortages of labor (all of which occurred) might require extensions of time of indeterminate periods, and that any extensions of the time or times of performance would require varying portions of the work to be done during the spring thaw.
18. Utica is situated in one of the coldest areas in New York State.a Once the hard freeze begins, frost usually penetrates the ground to a depth of 48 inches. Spring thaws may be expected any time after March 10, but may be delayed until later. The contracting officer made his plans for the contract in suit on the assumption that the spring thaw would occur at the end of March or the beginning of April.
19. Plaintiff’s completion schedule manifestly contemplated that the placing of foundation piers and the digging and filling of utility trenches (all of which had to go below the frost line) and other items of ground work of a similar nature, would have to be done in frozen soil.
By the time plaintiff’s workmen began to arrive at the site it was possible to drive cars and trucks anywhere in the site on frozen ground.
*670 20. Plaintiff’s contract provided that in case of failure of the contractor to complete the work on or before the dates specified for completion, “plus any extensions * * *, liquidated damages will not be assessed, but the contracting officer may terminate the contractor’s right to proceed with the work.”[1] It further provided that in the event of termination for failure of the contractor to prosecute the work with “such diligence as will insure its completion within the time specified * * *, or any extension thereof * * *, the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall be liable to the Government for any excess cost occasioned * * * thereby.”[2]
21. The specifications provided:[3]
The grading of the site, being performed by others, will probably not be complete at the time of commencement of work under this contract. Such non-completion will not be the basis of a claim for more money or more time, and this contractor will be required to work at available locations and not wait until grading is all completed. * * *
22. Notice to proceed was received by plaintiff on December 21, 1942. At that time grading had been completed on 41 building sites. Some of plaintiff’s workmen, including one survey crew, arrived at the site a few days later. Plaintiff’s superintendent arrived on January 2, 1943. The staking out of two buildings had been completed as of the latter date.
23. The grading contractor continued at work, grading terraces and completing road bases. Frozen ground became a serious problem after the middle of December 1942. From the beginning of the freeze, chunks of frozen earth had to be contended with. In x-oad work the chunks were broken up, where possible; and when they could not be broken, they were removed. Many of the frozen chunks were left in place in the gi-ading of terraces, where the surface did not have to be compacted.
*671 Winkleman continued his efforts all through January and to the end of February 1943. The remainder of his work was suspended on February 27, 1943, to await more favorable weather. At the time of the suspension all building sites had been graded, all major access roads had been built, and most of the ditches were in. Uncompleted items included several minor access or tributary roads, most of the parking areas, ditches for such access roads and parking areas, some shoulders of the main roads, all french drains (except on Hoad A), and all dressing of ditches and slopes requiring hand labor, which could not be done while the ground was frozen.
24. Plaintiff encountered the kind of delays which are now familiar in war contracts of that period. Labor was in short supply. Government-furnished equipment and allocated materials did not arrive on schedule or in the order most suited to steady progress. Winkleman was still working on the site, and plaintiff’s work had to be planned and executed accordingly. The winter was unusually severe. There were days of extreme cold. High winds were frequent, intensifying snow drifts. Through January and February 1943, plaintiff’s work proceeded with reasonable dispatch under all of the circumstances, with the exceptions noted below.
Foundation piers were placed on sites where plaintiff could proceed with building construction. Plaintiff did not sink all the piers that might have been placed.
Utility trenches were barely started by the end of February. The continuation of Winkleman’s work on the site complicated the planning of utility trenches, but plaintiff did not dig all of the trenches that could have been dug.
Plaintiff planned and prosecuted its work in such manner as to make use of the sites available to it for construction. It anticipated almost from the outset the possibility that much of the work would be delayed until after the end of the hard freeze, and it took advantage of the prospect to postpone foundation piers and utility trenches which could wait, confident that such construction would be easier after the ground thawed.
25. During this period plaintiff was able to get around the site with trucks, tractors, and tractor-borne equipment mov *672 ing over frozen ground. The movement of such equipment was not confined to the roads. In several places the equipment crossed the ditches, causing some ravelling of the edges, and in a few places earth fill was thrown into the ditches to enable the equipment to cross. In two or three places lumber or other material was unloaded in the ditches.
Snow drifted in the ditches and over culverts. During the latter part of February enough rain fell for the runoff to indicate the extent of these obstructions of the drainage system. Defendant admonished plaintiff to remove the obstructions, and plaintiff did remove some, but not all, of them.
26. The General Conditions of the construction contract provided:[4]
(b) Highways. New York Highway No. 5 passes approximately 1 mile south of the site of the work. New York Highway No. 31, a concrete highway extending west from Utica, is along the site of the work. The contractor shall provide for his own construction roads. He shall make his own investigations of available roads for transportation, of load limits for bridges and roads, and other road conditions affecting transportation of materials and equipment to the site of the work.
Defendant expected the construction contractor to use the perimeter and access road bases installed by Winkleman, and intended that he should do so. The building area had to be used for construction, including the erection of buildings, and the installation of trenches and utilities. The time, cost, and confusion of a separate system of construction roads within the construction area were not within the contemplation of either party.
The 12-inch gravel course topping the elevations of earth on the roads was sufficient for relatively heavy duty, and had been placed in anticipation of construction hauling on the roads.
27. New York State imposes load limits on the use of secondary highways built as were the roads on the contract site and finished with an impervious surface. Such load limits are lower during the period of spring thaw than in other seasons of the year.
*673 Highway engineers and contractors familiar with conditions aronnd Utica knew that trouble was sometimes encountered in the construction and in the use of roads in that area during spring thaws. The extent of their knowledge of the causes of such difficulties or how they could be overcome is not established by the evidence.
Defendant’s engineers who designed the road bases on the contract site, including the engineer who became the contracting officer, had some knowledge of adverse experience in highway maintenance in that area. The extent of their knowledge is not established by the evidence: neither does the evidence show that plaintiff had any knowledge of such adverse experience.
The engineer who became defendant’s contracting officer believed that the roads on the contract site would have to be protected during the spring thaw by adequate maintenance and by considerable curtailment of the load limits; otherwise, serious damage to the road bases might be expected. He further believed that plaintiff, by adhering to the schedule of completion dates, would have most of the heavy hauling done by the time of the spring thaw (which he anticipated about the first of April), and that in any event, it was and would be plaintiff’s responsibility to maintain, and if necessary, to restore the road bases, if they should be damaged by construction hauling during the spring thaw.
28. When Winkleman’s work was suspended, defendant accepted his work as far as it had gone, and charged plaintiff with the maintenance of the roads and ditches. Plaintiff protested, in writing. Defendant, in writing, rejected the protest. The exchange of correspondence thus begun culminated in the filing by plaintiff of a formal claim some two and one-half months later.[5]
*674 29. By the 10th of March 1943, plaintiff was getting ready for the big push toward rapid acceleration of the job. Heavily loaded trucks were moving lumber and other building materials into and on the site in volume. Surveys had been completed for extensive portions of the utility trenches, and equipment for that work was already on hand or soon to be available.
30. On March 11, 1943, the spring thaw began. This was the first day of the spring season on which the lowest temperature for the day was above freezing. Eain fell on March 11 and 12, to the extent of three-fourths of an inch. Another rainfall of 1.18 inches occurred on March 16 and 17, making a total of nearly two inches of rain within one week.[6] The rainfall was not enough to melt or wash away the drifts of snow in the ditches and around the culverts. It was sufficient to begin the withdrawal of frost from the ground, a process which lasted for several weeks.
31. Some ponding of water and an abundance of mud are evident in any area of raw ground during a spring thaw. Plaintiff and defendant saw these evidences, but read in them no special significance. Both were engrossed in the endeavor to accelerate the work. They were being reminded almost daily of its urgency. Moreover, plaintiff’s supervising engineer and defendant’s contracting officer were approaching a stubborn deadlock, from which neither was to withdraw, as to the responsibility for the maintenance of the roads and drainage.[7] Neither had knowledge of the cause or the extent of the conditions about to be encountered.
32. Plaintiff continued to bring in huge trucks heavily loaded with materials for use by its workmen and subcontractors. Tractors with road surfacing attachments were used in an effort to push the mud aside and keep the trucks moving. Within a week or ten days after March 11, 1943, the whole road system disintegrated. Trucks mired to the cab. Tractors sent in to rescue the trucks got stuck and required the aid of caterpillars. In the ensuing days and weeks, caterpillars which were stationary and apparently *675 resting on stable ground were seen to list and tilt as the ground gave way under them.
In portions of the terraced area a similar situation developed and persisted for weeks. Steam shovels operating in the building area had to be set on pontoons.
As the frost left the ground water ponded in all low places. The ditches flowed together, the culverts filled, extensive depressions appeared in various places, destroying the previously prepared grades, and the terraces ravelled and flowed. Within a month after the thaw began, the entire building site was a sea of plastic mud.
33. The science of soil mechanics is relatively new. The first studies were begun only 25 years ago into the nature and content of soils, the degree of fines, whether silt or loam, their tendencies toward porosity, plasticity, and capillarity, and the relation of their content and characteristics to compaction, frost heaving, and other incidents of weather and construction. Enough was known in this field in 1942 that’ either plaintiff or defendant might have been advised of the conditions to be encountered at the job site, if either had consulted this special field of knowledge. Neither party sought such advice before the event. Enough was not known of this field of knowledge in 1942 for either party to be charged with lack of diligence in not consulting it.
34. In this finding and the one succeeding it, the facts pertaining to the construction site as revealed by the science of soil mechanics are summarized.
The soil on the building site and in the borrow pit was a glacial till, a combination of stones, sand, gravel, and silt,[8] with a small amount of clay. It contained a high proportion (40 percent) of fines that would pass a 200 mesh sieve. Underlying the soil at varying depths was a bedrock of shale.
The soil was relatively impervious to water, hence both seepage and saturation occurred slowly. Once saturated, seepage continued to be slow, retarding subsurface drainage. The soil was plastic in some stages of its moisture content, almost fluid in others, and possessed a high degree of capillarity. It would draw water upward a distance of six or eight feet. Because of this characteristic, the water which *676 bad been, caught in it in November, and held there during the freeze, tended, as the thaw progressed, to seek outlet on the surface. Until all the frost had left the ground, seepage downward by gravitation could not occur. The capillarity of the soil was sufficient to add appreciably to the volume of the surface drainage.
35. Proper treatment of the site during the thaw, to protect it from damage and need for extensive restoration after the thaw, would have required (1) that all pressure be kept' off the roads, so that the gravel bases would not sink into the wet, plastic earth beneath; (2) that all ponding, in trenches, graded sites, and elsewhere be eliminated by appropriate drainage measures; and (3) that all ditches and culverts be kept open and functioning to full capacity, to the end that surface drainage might outstrip (a) water brought to the surface by capillary attraction and (b) additional rainfall. It would have been essential to maintain this treatment long enough to enable the surface soil (the uppermost few inches) to dry out, by gravity run-off and evaporation, and by so drying to keep the capillary action in motion, until such time as the entire site showed signs of stabilization. Two or three weeks would have been required as a minimum, if there had been no additional rainfall.[9]
36. Unaware of the need of this special soil for the kind of treatment indicated, plaintiff bulled its way through the condition to get the work done. The resulting confusion was intensified by the additional rainfall of April, May, and June. The site did not dry out enough for grading operations to be resumed until July.
As the gravel bases on the roads sank into the soft earth and disappeared, plaintiff increased the weight of the traffic, adding road machinery to the trucks. When plaintiff’s suppliers and subcontractors refused to bring their equipment onto the site, plaintiff improvised sleds drawn by caterpillar tractors to haul materials to the stations of use. Pontoon walks were built for wheelbarrows. Men and materials moved with great difficulty. The cost of performance mounted steadily.
*677 37. Defendant’s representatives on the site saw the conditions, of course. Some of them knew that special difficulties were sometimes encountered in that area during spring thaws.[10] None was fully informed of the reasons for or the extent of such difficulties.
Plaintiff did not ask permission to suspend operations in any degree. Defendant never suggested such a course.
Meanwhile, plaintiff was demanding relief by reimbursement for the added expense, charging that it had been occasioned by faulty design and faulty construction of the roads and of the drainage system.
Defendant met these demands with repeated directions to plaintiff to unwater the site and get on with the job. Plaintiff, maintaining the consistency of its position that this work was the responsibility of others, continued to pay scant attention to the drains, and little more to the culverts. In sheer self-defense, it hauled into the road system enough stone, slag, and other coarse materials to restore some degree of stability.
On April 19, 1943, plaintiff notified defendant that a formal claim would be filed.
38. While the formal claim was being prepared, plaintiff consulted an engineer who had made a study of soil mechanics. The engineer examined the site, which was still quite wet (on May 15, 1943), analyzed samples of the soil from the construction site and the borrow pit, and reported his conclusions to plaintiff. The engineer’s discussion of soil mechanics comprised a minor part of his report, which contained an extensive analysis of the contract provisions and conclusions thereon. These latter conclusions were in the nature of a legal opinion. Plaintiff incorporated the engineer’s report in its formal claim, which was submitted to defendant on May 24, 1943.
39. The statement of claim submitted by plaintiff consisted of a substantial volume of correspondence, exhibits (photographs) , explanations, and argument, divided into 11 parts. Part I was described in the index as “Covering Letter and Request for Personal Hearing.” The letter was addressed to the contracting officer and contained the following:
*678 We submit, herewith, our request for findings of fact and for an equitable adjustment of the Contract Price by reason of road and drainage conditions.
* * * we present this report which we hope will enable you to review our case and judge it upon the merits of the factual evidence contained therein.
We request a personal hearing * * *.
Your early and favorable action on our request that an equitable adjustment be made to the contract price to compensate us for costs of additional construction work not anticipated or included in the contract documents will be appreciated.
Part II of the statement of claim, entitled “Contract Stipulations,” set forth the texts of Article 1 of the contract (Statement of Work), Article 4 (Changed Conditions), and the requirement in the invitation for bids that bidders visit the site and investigate conditions for themselves.
Article 4 of the contract was the standard provision relating to Changed Conditions.[11]
These contract provisions were followed by narrative statement and argument designed to show (1) that plaintiff had done what was required of it and (2) that roads and drainage were not its responsibility.
Parts III to IX of the statement of claim contained further details pertaining to conditions existing at the site at various times, their causes (with emphasis on the shortcomings of defendant’s designing and Winkleman’s construction of the roads and drains), and actions taken by plaintiff in the light of the conditions encountered.
Part X was the report made to plaintiff by the engineer-soil mechanic, mentioned in the preceding finding.
Part XI contained plaintiff’s Request for Findings of Fact. The request was contained in a letter dated May 24, 1948, addressed to the contracting officer. The opening paragraph follows:
In view of the statements, information, correspondence factual evidence and contract stipulations set forth herein before, the Contractor hereby contends that it has been compelled to perform work beyond the scope of the contract; encountered unforeseen conditions beyond its control and not due to its fault or negligence and was *679 deprived of the use of road facilities contemplated in the preparation of the bid, all of which caused greatly increased costs and substantial delay in the performance and completion of the Contract.
The requested findings of fact were set forth in 122 separate, numbered paragraphs. They contained statements of subsidiary facts, ultimate facts, and conclusions of fact and law. They covered the subject in considerable detail. The concluding request follows:
Contractor is entitled to an equitable adjustment of its contract price by reason of the conditions complained about.
40. The statement of claim filed by plaintiff on May 24, 1943, contained no suggestion as to the amount of adjustment considered by it to be equitable. This was contained in a “Supplement to Report” which plaintiff filed with the contracting officer on July 5, 1943. The covering letter of the supplement said, in part:
Pursuant to conference held in your office June 15, 1943, * * * there is submitted herewith statement of added costs * * *.
The statement is divided into nine categories of work designated Items Nos. I to IX * * *. Such work and costs are presented as being beyond the scope of the contract requirements; resulting from conditions beyond the control and without the fault and negligence of the Contractor and being unforeseeable thereby not enabling such costs to have been considered or included in the bid * * *.
It is requested that * * * early and favorable action be taken in accomplishing an equitable adjustment of the Contract price in accordance with the added costs submitted. * * *
The elements of alleged extra cost, which comprised Items I to IX, were the same as the nine items first listed by the War Department Board of Contract Appeals, as set forth in finding 45 and as hereinafter reviewed in findings 61 to 69.
41. (a) The statement of claim which plaintiff filed on May 24, 1943, was reasonably designed to make clear to the contracting officer plaintiff’s belief (1) that it was entitled to an equitable adjustment of the contract price and (2) that the contracting officer was authorized by Article 4 of the contract *680 to make such an equitable adjustment based on the reasons given by plaintiff.
(b) This statement of claim was not reasonably designed to present to the contracting officer a claim for an equitable adjustment of the contract price specifically based on the discovery of “* * * subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications * *
(c) The supplementary statement which plaintiff filed with the contracting officer on July 5, 1943, contained items as to which, from their nature and from plaintiff’s analysis of them, relief to the contractor could reasonably be made only under Article 4 of the contract, if at all.
(d) The claim which plaintiff submitted to the contracting officer, considered in its entirety, was reasonably designed to present a claim for an equitable adjustment of the contract price based on grounds which included the discovery of “* * * subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications * * (Such conditions are hereinafter sometimes referred to and differentiated as “latent” conditions and “unknown” conditions.)
42. On October 19, 1943, the contracting officer denied plaintiff’s claim. His “findings” and decision follow:
a. Primary site information was made available to all prospective bidders under Invitation No. 321-43-49, dated 2 December 1942. Attention was directed to the necessity for visiting the locality of the work and the bidder’s responsibility for determining all conditions pertinent to the work required.
b. The construction schedule required considerable winter construction with its attendant difficulties.
c. Grading operations under another contract were in progress and the methods employed were readily apparent.
*681 d. Failure on the part of the bidder in recognizing and considering any of the delaying factors or increased costs involved through prosecution of the work does not relieve the bidder from any responsibility attached thereto.
e. It was contemplated that the road bases constructed by others, under a separate contract, would be used for construction purposes under Contract No. W-321-eng-800, however it was also evident and foreseeable that maintenance of these roadways would be necessary throughout the construction period. No finished surface was provided and the subject contract included the completion of the road structure. Proper road maintenance was an obligation of the John A. Johnson Contracting Corporation both in providing a means of transporting equipment and supplies throughout the project and to reduce the reconstruction necessary prior to the final surfacing.
f. Major reconstruction operations and increased costs could have been avoided through earlier maintenance operations.
Plaintiff has not challenged this decision as being fraudulent.
43. On November 16, 1943, plaintiff appealed the decision of the contracting officer to the Secretary of War. The letter said:
This appeal is made pursuant to Article 15 of the contract, and Paragraph 1-19 of the specifications.
Attached to the letter and made part thereof were copies of plaintiff’s request to the contracting officer for findings of fact and of “the supplement to our request for findings, showing our loss * *
44. On December 13, 1945, plaintiff’s claim was denied in part and dismissed as to the remainder by the War Department Board of Contract Appeals (hereinafter referred to as the Board).
Plaintiff has not challenged this decision as being fraudulent.
45. The Board’s “Opinion” contained the following:[12]
The appellant’s claim, which forms the basis of its appeal, is for additional compensation for reconstruction and restoration of the road drainage ditches and *682 terraces, and for alleged increased cost to appellant in performing the contract work by reason of the failure of such road bases and drains. The claim * * * is itemized as follows:
“Item I. Reconstruction and stabilization of road bases * * *.
“Item II. Reconstruction and maintenance of drainage ditches and culverts * * *.
“Item III. Regrading terraces and slopes * * *.
“Item IV. Unusual construction methods and excessive work, including removal and replacing of excessive quantities of earth in connection with excavation of utilities, wall footings, and pier foundations; transportation of the equipment on plank runways with assistance from a bulldozer rather than under equipment’s own power; excessive excavation cost; excessive dewatering operations * * *.
“Item Y. Restoration of work already performed but damaged as a result of unstable ground conditions * * *.
“Item YI. Rehandling of materials caused by muddy road conditions * * *.
“Item VII. Reduced efficiency of equipment resulting from muddy conditions, including excessive repairs and time lost due to miring * * *.
“Item VIII. Reduced efficiency of workmen by reason of irregularity of flow of materials resulting from muddy road conditions * * *.
“Item IX. Additional administrative and supervisory expense * * *.
“Item X. Excessive transportation costs of * * * a subcontractor * *
46. Items I, II, and III were denied by the Board. Items IV through X were dismissed. The Board’s reasoning, as contained in its “Decision,” follows, in part:
* * * The trial attorney takes the position that the Board has no jurisdiction to consider the claim because the basis upon which it is predicated is an alleged breach of the contract. It is contended that the claim is for unliquidated damages, based upon the alleged wrongful acts of the Government and its agents, and that such basis permeates each item of the claim.
The Board does not agree with the trial attorney with respect to the first three items of the claim. These items, it appears to the Board, are for determinations as to whether the work for which extra compensation is sought was required by the contract terms to be performed by *683 the appellant and were included in the contract price; whether such work amounted to a change within * * * Article 3 or was a result of and rendered necessary because of changed conditions within * * * Article 4 * * *, or amounted to an extra within * * * Article 5 * * *.
The Board is of the opinion that it was the appellant’s responsibility, under the contract and under the facts and circumstances presented, to repair, reform and reshape the roads and drainage systems including the terraces, and to do the work embraced in Items I, II and III of the claim, as heretofore set forth. It appears evident that the parties contemplated that some amount of such work would be necessary when the time came for appellant to perform its operations on the mentioned areas; while the extraordinary large amount of such work may not have been expected, the Board feels that the evidence justifies the conclusion that the acts of appellant, in substantial part, caused the almost total failure of the roads and drains thus necessitating the large amount of such work.
The contract clearly provides that the appellant should provide its own construction roads. However, it elected to use the roads constructed by Winkleman rather than prepare other roads over which it was to haul its equipment and material. The Government made no objection to such use of roads, but, neither did it make any warranty as to the stability, weight limits, or other conditions of the roads. At the time appellant made its decision to use the roads constructed by Winkleman rather than provide its own construction roads, it knew, of course, that such use by it would, in some degree, affect the grade of roads, requiring maintenance, shaping and repair. The contract is clear in requiring the restoration of such roads by appellant before the application of the surface, which was one of the operations for which appellant was to be paid. The record is clear that the roads were used in such a manner by the appellant as to indicate disregard for the effect its use would have on, and the future condition of, the road beds and adjacent drains.
The roads were, as was known by appellant, designed as hospital roads, not for heavy traffic nor for any such heavy loads as were transported over them by appellant. * * *
* * * The Board agrees * * * that Items IV through X * * * are in effect claims for unliquidated damages based upon an alleged breach of contract on the part of the Government. These items are * * * predicated *684 upon increased cost incurred by appellant in performing its contract work because of tbe failure of road bases and drains. * * *
47. (a) In the Board’s review of the facts established by the evidence before it, there was no reference in substance or form to “subsurface and/or latent conditions at the site * * or to “unknown conditions of an unusual nature” within the purview of Article 4 of the contract.
(b)In the decision which followed the factual summary, the Board said:
It cannot be said that the work forming the basis for the instant claims was necessitated by or the result of “Changes”, “Changed conditions”, or “Extras”, within the purview of the contractual provisions relating to these subjects.
48. It is not established by the evidence:
(a) That plaintiff called upon the contracting officer to investigate the site for latent or unknown conditions;
(b) That plaintiff realized that it had encountered latent or unknown conditions in time to request an investigation by the contracting officer before such conditions were disturbed;
(c) That the contracting officer considered or made findings of fact based upon a claim presented by plaintiff because of latent or unknown conditions;[13]
(d) That the War Department Board of Contract Appeals made findings of fact pertaining to the existence of latent or unknown conditions.
49. (a) It is not established by the evidence that plaintiff encountered, during the progress of the work, subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications.
(b) During the progress of the work plaintiff did encounter unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally *685 recognized as inhering in work of the character provided for in the plans and specifications.
50. The elements comprising these “unknown conditions of an unusual nature” included the following:
(a) The quality of the soil which made it retain moisture, once the moisture had been absorbed;
(b) The tendency of the water in such soil to draw together in ice lenses during periods of hard freeze; and
(c) The high capillarity of the soil, which tended to draw water upward from depths of six to eight feet.
These elements combined, during the spring thaw, to create a situation differing materially from that ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications.
51. The elements listed in the preceding finding also combined to make the design and construction of the road bases both inadequate and defective.
52. (a) Absent the unknown conditions described in finding 50, defendant’s design of the road bases was neither inadequate nor defective.
The design of the road bases was adequate, under conditions ordinarily to be expected, to sustain construction traffic, even during a spring thaw, if reasonable attention were given to drainage, maintenance, and load limits.
(b) In the absence of plans for the elimination of all traffic on the road bases during the spring thaw for a period long enough to permit stabilization after the frost had left the ground, the design of the road bases was inadequate for the conditions actually existing at the site. A road usable during the spring thaw could not have been constructed during wet winter months in the soil existing on the site without (1) extensive insulation, at a considerable depth, against the capillary action of the soil (such insulation to be provided by a layer of gravel as the foundation for compacted soil reaching to the sub-base of the wearing surface layer of gravel) and (2) complete drainage of the road during and after construction to the lower level of the insulating layer.
53. (a) Absent the unknown conditions described in finding 50, Winkleman’s construction of the road bases was neither inadequate nor defective in any major element. The *686 necessity for working ívhen the weather was both wet and cold left much to be desired in the compaction of fills. Road fills were placed on ground containing more moisture than would have been the case if time had not been pressing. Fault in this regard, if any there was, would be chargeable to defendant’s inspectors in permitting the work to proceed. Some frozen material was rolled into fills when defendant’s inspectors were not present. It is not established by the evidence that the use of either wet ground or frozen materials was of sufficient extent to have caused the failure of the road bases if built on and of the kind of soil ordinarily to be expected.
(b) In the absence of plans for the elimination of all traffic on the road bases during the spring thaw for a period long enough to permit stabilization after the frost had left the ground, the construction of the road bases was inadequate for the conditions actually existing at the site. The conditions actually existing would, if known, have made imperative (1) the construction of ditches and drains before the roads were cut or filled, rather than simultaneous construction of roads and ditches; (2) the rapid and complete installation of french drains through the shoulders of the roads; and (3) the suspension of all operations during wet weather until the work was dry enough to proceed, the propensities of this special soil considered.
54. The traffic sent over the road bases by plaintiff during the first few days of the spring thaw was heavy enough to cause extensive damage, even if the conditions which led to the failure of the roads had not existed. If conditions ordinarily to be expected had prevailed, plaintiff’s traffic would have created the necessity for substantial repair work before the roads could have been resurfaced. It is not established by the evidence that this traffic would have caused the complete failure and disintegration of road bases similarly constructed in the kind of soil ordinarily to be expected.
55. The road bases disintegrated. The roads failed completely.
The cause of such disintegration and failure was the pressure of traffic applied during the spring thaw. Any construction traffic would have produced the same result. The extra *687 weight and volume of plaintiff’s traffic only hastened the process. They were not, in themselves, the cause of it.
Neither plaintiff nor defendant knew that traffic would have such an effect on the road bases. If either ought reasonably to have known what to expect, so should the other. It is not established by the evidence that either one should reasonably have anticipated the result.
56. (a) Defendant’s design of the drainage system (culverts and ditches) was adequate to serve the purpose for which it was intended, namely, to drain the site when it had been covered (surfaced or roofed) to the extent of 25 percent of the area, and turfed as to the remainder.
(b) The design was inadequate to provide drainage for the site unprotected by either cover or turf, except during the winter freeze. It would have been inadequate to provide such drainage, if the unknown conditions described in finding 50 had not existed, because of the erosion of unprotected soil resulting from the velocity of the flow of water. When the winter freeze ended, it would have been necessary for any construction contractor working on the site to have supplemented the drainage system with vigilant maintenance to keep the ditches and culverts open, with some additions to their capacity, and with some temporary headwalls and rip-rap to prevent erosion.
(c) The design was defective insofar as it was based on the assumption that drainage for the site unprotected by cover or turf would not be needed except in winter weather. Defendant, as well as plaintiff, knew, or reasonably should have known, that the work might be extended beyond the completion dates initially established.
(d) In view of the unknown conditions existing at the site, as described in finding 50, the design of the drainage system was inadequate, once the spring thaw began, (1) to provide drainage for the site, (2) to withstand the velocity of the flow of water, or (3) to remain intact under the strain of flowage, pondage, and capillary action, without supplementary capacity, temporary protection, and vigilant maintenance, even if construction work had been curtailed or halted.
*688 (e) The drainage system was constructed as designed, except insofar as defendant permitted Winkleman to suspend before completion.[14]
57. From the middle of March until late in April 1943, while the frost was coming out of the ground, plaintiff dug the utility trenches, which crossed and paralleled the road bases and extended throughout the construction area to the various buildings. Stretches of the trenches were left open or only partially backfilled, during considerable periods of time. Additional pier holes also were dug. Mounds of earth from these excavations were piled without regard to drainage, sometimes being thrown into what remained of the ditch channels. Water collected in the holes. When it was pumped out, to dewater an immediate work area, the water was permitted to flow where it would, no channels being provided.
In the course of this work, the drainage system deteriorated almost to the vanishing point. The shoulders of the roads sloughed into the ditches. The channels of the ditches filled and levelled out. Culverts remained clogged. Terraces ravelled and flowed. Additional rainfall and the continuation of capillary withdrawal of water from underground kept the site very wet.
Plaintiff continued to work in the mud throughout April and May.
During this period plaintiff did not take the precautions which a prudent contractor should reasonably have been expected to take to alleviate the situation, and to minimize damages, assuming without conceding the validity of the contractor’s position that defendant should reimburse it for the extra costs incurred. After two or three weeks in the mud at the building site, any competent contractor should have seen, without expert or technical guidance, that adequate drainage of the site was indispensable to progress in terms of time and cost.
58. (a) Plaintiff completed the structures in the following order:
Barracks and headquarters (Group 2), on September 1,1943.
*689 Warehouses, telephone, and administration buildings (Group 1), on September 22,1943.
All other buildings and utilities (Group 3), on October 19,1943.
The completion of Group 4 (road surfacing, fine grading, and seeding) is the subject of a separate claim, hereinafter described. (Findings 71 to 101.)
(b) Plaintiff stabilized the road bases and brought them to grades acceptable to defendant. Eventually, the drainage system was largely rebuilt by plaintiff, and the grading of terraces was restored.
In the process of rebuilding and restoration, defendant made some changes in grades to adapt to conditions found to exist after the ground finally dried out.
Defendant also provided by change orders for some additional buildings.
59. (a) Plaintiff’s total cost of performance was $3,341,-584.35. Payments to plaintiff by defendant totalled $2,613,-594.92. The difference between cost of performance and payments received is $727,989.43, representing 21.78 percent of the cost of performance and 27.85 percent of the total payments.
(b) Defendant contends for the inference that plaintiff underbid the job by the amount of its loss, approximately. Such inference is not warranted by the evidence as a whole.
(c) Plaintiff contends that the excess of cost of performance over payments received reflects the additional costs incurred by it in overcoming the conditions resulting from the failure of the road bases and drainage system. The evidence as a whole does not warrant such a finding.
60. (a) As proof of the extra costs alleged to have been incurred plaintiff, in the trial of this action, presented a copy of the schedules which it submitted to the contracting officer on July 5,1943.[15] These schedules are comprised of the nine *690 items first listed by the Board of Contract Appeals as set forth in finding 45.
Each item represents a general grouping, such as road stabilization and reconstruction, drainage maintenance and reconstruction, et cetera. Under each item plaintiff has set forth (1) its rationale of the causal relation between the failure of the roads and grading and the stated item; (2) the elements of work in which extra costs were incurred, Such as materials purchased, costs of trucks and equipment, labor, et cetera; and (3) the itemized costs of such elements.
(b) Final costs had not been incurred when plaintiff submitted its claim to the contracting officer. Estimates of the cost of finishing uncompleted work were therefore included in some items.
Before the trial of this action many of plaintiff’s records of the costs of performing the contract in suit were lost. The deficiencies had to be supplied by secondary evidence.
(c) The record as a whole supports the conclusions: (1) that plaintiff incurred some additional costs in each of the categories listed by it; (2) that part of such additional costs was incurred as the result of conditions encountered and without fault on the part of plaintiff; and (3) that part of such additional costs was attributable as much to plaintiff’s failure and refusal to try to counteract the conditions encountered as to the conditions themselves.
The nature of the evidence relating to extra costs incurred by plaintiff in the performance of the contract is such that findings of the precise amounts of such costs, resulting from conditions encountered by plaintiff and without fault (by action or inaction) on its part, cannot be made.
Under the circumstances, it is possible to arrive at the amount of additional costs incurred by plaintiff as a result of the conditions encountered, and without contributory action (or inaction) on its part, only by approximations.
(d) In the nine findings next following the items of plaintiff’s claim are analyzed in terms of (1) the elements of work listed by plaintiff, (2) the causal relation to such work of (i) the conditions encountered during performance and (ii) contributory action or inaction by plaintiff, and (3) the amount of additional costs (approximately) established by *691 the evidence as being the result of conditions encountered and which plaintiff could not reasonably have been expected to anticipate or avoid.
61. Road stabilization and reconstruction. Under this heading plaintiff has listed the work of removing unsuitable fill and the placing of suitable materials to stabilize the roads, and the reshaping of the roads as reconstructed and stabilized. Plaintiff says the work was begun on March 2, 1943, and that it included materials (gravel, cinders, and masonry debris), transportation (trucking) and equipment costs, and labor.
Plaintiff performed the work it has described.
Work done on the road bases prior to March 11 was maintenance work. Such work was not made necessary by the unknown conditions encountered after the spring thaw began. The evidence affords no basis for segregating the cost of the work done prior to March 11 from that done after March 11, beyond the conclusion that maintenance work done prior to March 11 was a minor part of the overall cost of caring for the roads.
If the roads had not failed, some additional maintenance work would have been required throughout the spring thaw and until the end of plaintiff’s construction work. The evidence affords no basis for estimating in detail what the cost of such maintenance work would have been.
The roads had failed within a week after March 11. Work done on them on and after March 11 may reasonably be considered as stabilization and reconstruction work.
Such work was made necessary by the unknown conditions encountered during the spring thaw.[16] It required the use of materials, equipment, and labor, of the kinds plaintiff has listed in its claim.
The cost of such work which plaintiff could not reasonably have been expected to anticipate (such as some maintenance work) or to avoid (none in this instance) was, in round numbers, $30,000.00.
*692 62. Drainage maintenance and reconstruction. Under this heading plaintiff has listed the work of “complete reconstruction of the ditches” and “excessive maintenance of cdlverts.”
Plaintiff did, in large measure, reconstruct the drainage system and, after some time, assigned crews to maintenance. The costs listed by plaintiff are based entirely on the use of labor said to have been assigned to specific crews for construction and maintenance.
The initial undertaking of the reconstruction of the drainage system and a substantial portion of the maintenance of it were made necessary by the unknown conditions encountered during the spring thaw.[17]
If the drainage system had not failed, some maintenance work would have been required throughout the spring thaw and until the area was seeded and turfed. More maintenance work would have been required, even under this assumption, than would have been required if the drainage system had been designed to carry the run-off from an uncovered, un-turfed area. The evidence affords no basis of estimating in detail what the cost of such maintenance work would have been.
The drainage system did not fail as rapidly as the road bases. Its failure might have been further delayed by prompt action by plaintiff in removing obstacles from the ditches (some of which it had placed there, such as dirt crossings and piles of lumber), in clearing away ice and snow from the channels, and in unstopping the culverts. It is not established by the evidence that such maintenance would have prevented the ultimate failure of the drainage system or lowered the cost of reconstruction.
The cost of reconstructing and maintaining the drainage system which plaintiff could not reasonably have been expected to anticipate (such as some maintenance work) or to avoid (none in this instance) was, in round numbers, $25,000.00.
63. Regrading of areas. Under this heading plaintiff has listed the work of restoring terraces to grade which, it says, *693 was complicated by the quagmire condition which prohibited the use of bulldozers for backfilling utility trenches, requiring the work to be done by power shovels operating on mats. Plaintiff lists, as elements of cost, the rental of power shovels and the fuel and labor needed to operate them.
Plaintiff did the work it has described.
The regrading of terraces was made necessary by the unknown conditions encountered during the spring thaw.[18] Absent these conditions, some repair work would have been required, but whole segments of the area would not have been out of line and grade. The quagmire of the spring thaw made necessary the use of floating mats or platforms on which to place power equipment.
The work of regrading was increased (1) by plaintiff’s election to postpone the digging of trenches and pier holes until after the ground had thawed and (2) by plaintiff’s failure to move more promptly in reestablishing the failing drainage system. The evidence affords no basis for estimating in detail the amount of these increases.
The cost of regrading which plaintiff could not reasonably have been expected to anticipate (some minor repair work) or to avoid (such as the increases described in the preceding paragraph) was, in round numbers, $5,000.00.
64. Unusual construction methods and excessive work. Under this heading plaintiff lists the necessity for plank mats and runways to hold power machinery, the use of bulldozers to transport the power machinery, the excavation of excessive quantities of earth for trenches and footings, the need for sheeting parts of the excavation, the use of hand labor, and the need for excessive dewatering of excavations.
Plaintiff did the work it has described.
Elements of cost listed by plaintiff include: (1) plank mats, the cost (in labor and materials) to construct them, and the rental of machinery (bulldozers) and labor needed to operate it in moving the mats from place to place; (2) handling excess quantities of earth for excavations, being the cost (computed on a cubic yard basis for the alleged excess) of earth removal from steam and sewer trenches, piers, *694 and foundation walls, labor for sheeting, and the cubic yard cost of removing and replacing certain fill; (3) equipment rental and operating labor cost of additional equipment for pier excavations; (4) hand labor used in digging and sheeting pier holes; and (5) equipment rental and operating labor cost for excessive excavation for utility lines and culverts.
The use of plank mats to hold power machinery, the need for bulldozers to transport such equipment, the need for constant dewatering and some extra excavation and sheeting were made necessary by the unknown conditions encountered during the spring thaw.[19]
The need for most of these unusual measures was increased (1) by plaintiff’s election to postpone the digging of trenches and pier holes until after the ground had thawed and (2) by plaintiff’s failure to move more promptly in reestablishing the failing drainage system. The evidence affords no basis for estimating in detail the amount of these increases.
The cost of the unusual construction methods and additional work which plaintiff could not reasonably have been expected to anticipate (none in this instance) or to avoid (such as the increases described in the preceding paragraph) was, in round numbers, $22,000.00.
65. Work damage and restoration. Under this heading plaintiff listed the necessity for repairing and restoring work that had been done, because of the sloughing of sewer trenches, manhole excavations, steam conduit trenches, and building and walkway foundation excavations; the movement of water main alignments and concrete mats; the dis-lodgment of electric poles, guy anchors, and batter boards; and the collapse of one foundation.
The elements of cost were itemized in terms of various unit costs (cubic yard excavation, man-hours, and equipment rental) for doing the work of repair and restoration.
Plaintiff did the work it has described.
The necessity for this work was the result of the unknown conditions encountered during the spring thaw. None of it would have been necessary except for such conditions.
*695 Some of the work would have been obviated (1) if plaintiff had not elected to postpone so much excavation until after the ground thawed and (2) if plaintiff had moved more promptly to reestablish the failing drainage system.
The cost of work damage and restoration which plaintiff could not reasonably have been expected to anticipate (none in this instance) or to avoid (such as the matters described in the preceding paragraph) was, in round numbers, $20,000.00.
66. Unusual distribution methods and rehamdling of mar terials. Under this heading plaintiff has listed the necessity for receiving materials from suppliers off-site or payment to them of extra compensation for on-site delivery; the storage of materials, with consequent unloading and reloading; the hauling of box sleds drawn by bulldozers; the final distribution by wheelbarrow and by hand; and the consequent rehandling of materials.
Plaintiff did the work it has described.
The elements of cost were itemized in terms of rental rates for equipment used, cost of labor and materials used in making slabs and boxes, cost of labor to operate equipment, and extra payments to vendors.
The necessity for this work was the result of the unknown conditions encountered during the spring thaw.
Some of the work would have been obviated (1) if plaintiff had not elected to postpone so much excavation until after the ground thawed and (2) if plaintiff had moved promptly to reestablish the failing drainage system.
The cost of unusual distribution methods and rehandling of materials which plaintiff could not reasonably have been expected to anticipate (none in this instance) or to avoid (such as the matters described in the preceding paragraph) was, in round numbers, $50,000.00.
67. Reduced efficiency of equipment. Under this heading plaintiff has listed the reduced efficiency of such construction equipment as shovels, backhoes, and trucks. Costs were itemized in terms of equipment rentals and operating labor. Time and volume were estimated on the basis of experience.
The efficiency of equipment was reduced. The reduction *696 resulted from the unknown conditions encountered during the spring thaw.
The extent of the reduction as listed by plaintiff is not supported by detailed evidence of costs used as the basis for comparison.
The reduction would have been less (1) if plaintiff had not elected to postpone so much excavation until after the ground thawed and (2) if plaintiff had moved more promptly to reestablish the failing drainage system.
The cost of reduced efficiency of équipment which plaintiff could not reasonably have been expected to anticipate (such as normal reduction of efficiency during any period of spring thaw) or to avoid (such as the matters described in the preceding paragraph) is not established by the evidence with sufficient probity to warrant a finding thereof.
68. Reduced efficiency of workmen. Under this heading plaintiff has listed the reduced efficiency of workmen due to the inconsistent flow of materials and conditions hampering operations and time of travel to and from work. Time and volume were estimated on the basis of experience with a similar job during the preceding winter. Costs were itemized in terms of increased payrolls.
The efficiency of workmen was reduced as a result of the unknown conditions encountered during the spring thaw.
The reduction would have been less (1) if plaintiff had not elected to postpone so much excavation until after the ground had thawed and (2) if plaintiff had moved more promptly to reestablish the failing drainage system.
The cost of reduced efficiency of workmen which plaintiff could not reasonably have been expected to anticipate (such as normal reduction of efficiency during any period of spring thaw) or to avoid (such as the matters described in the preceding paragraph) was, in round numbers, $150,000.00.
69. Additional administrative and supervisory personnel required. Under this heading plaintiff has listed the increases of administrative and supervisory staff needed because of the additional workmen and equipment. Costs were itemized in terms of individual workmen and their payrolls during stated periods.
*697 Additional administrative and supervisory personnel were required as a result of the unknown conditions encountered during the spring thaw.
The increase would have been less (1) if plaintiff had not postponed so much excavation until the ground thawed and (2) if plaintiff had moved more promptly to reestablish the failing drainage system.
The cost of such additional personnel which plaintiff could not reasonably have been expected to anticipate (none in this instance) or to avoid (such as the matters described in the preceding paragraph) was, in round numbers, $8,000.00.
70. (a) The possibility of duplication of costs is evident throughout plaintiff’s itemizations. Such possibility has been considered in each instance, and allowances have been made as warranted by the evidence.
(b) The additional costs incurred by plaintiff in the items described in findings 61 to 63 (both inclusive) as a result of the unknown conditions encountered during the spring thaw and which plaintiff could not reasonably have been expected to anticipate or to avoid was, in round numbers, $60,000.00.
(c) The additional costs incurred by plaintiff in the items described in findings 64 to 69 (both inclusive) as a result of the unknown conditions encountered during the spring thaw and which plaintiff could not reasonably have been expected to anticipate or to avoid was, in round numbers, $250,000.00.[20]
GROUP 4 CLAIM
71. On May 18,1943, plaintiff requested extensions of time sufficient to carry the completion dates forward to June 15, for Groups 1 and 2; to June 30 for Group 3; and to July 30 for Group 4. On June 7, 1943, the contracting officer granted extensions establishing June 30 as the completion date for all four groups. The extensions were granted in change order No. 37, dated February 27, 1943 (although issued on June 7), which was predicated on “delays caused by unusually severe weather conditions, delays in delivery of allocated and Government furnished materials, and a criti *698 cal shortage of labor.” Plaintiff accepted the change order as issued.
72. On June 7, 1943, it was apparent to the contracting officer (1) that the work required in Groups 1, 2, and 3 would not be completed by June 30, and (2) that the work required by Group 4 (plaintiff’s part of roads and grading) could not be completed until Groups 1,2, and 3 were finished.
The naming of June 30 as the time for completion of all of the contract work reflected the establishment of a cut-off date more related to some undisclosed purpose of the contracting officer than to a realistic measurement of the actual delays encountered by plaintiff.
June 30 was a fiscal date of some importance to the contracting officer.
73. Defendant’s project engineer had directed plaintiff (by letter dated April 29,1943) not to undertake road surfacing until the subgrade was “thoroughly dried.” On June 29, 1943, the same official requested “that the construction of roads and surfacing * * * be started immediately,” adding that: “Under no condition is any surfacing to be placed prior to the specific approval of the reshaped foundation course by this office.”
The month of June was almost gone before the site became dry enough for plaintiff to undertake the grading (placing and spreading of topsoil and seeding) and road surfacing required by its contract.
In the meantime, Winkleman was also prevented from resuming operations to complete the portions of his grading contract left unfinished when his work was suspended on February 27,1943.
When the site finally dried, the unturfed grades and unpaved roads developed dust in such volume as to be almost as great a plague as the mud had been.
74. Winkleman resumed operations in July 1943.
On July 6, one of plaintiff’s subcontractors began work on road surfacing.
On July 12, another subcontractor began work on the placing and spreading of topsoil.
It had been agreed between plaintiff and defendant that some modifications would be made of the required elevations *699 of grades and road sub-bases to conform to existing conditions. New drawings were prepared as to the road elevations, and were delivered to plaintiff at various times between June 30 and July 15. One of defendant’s inspectors was assigned to supervise the grading, under instructions to approve such grading as would result in sufficient drainage of the site, without following contract contours exactly. Plaintiff followed the drawings as to the roads and instructions as to grading.
75. The work of plaintiff’s road surfacing subcontractor was suspended briefly on some occasions, pending decision by defendant as to revised elevations. Also, this subcontractor and Winkleman got in each other’s way from time to time, and road surfacing had to give way to grading. While Winkleman’s work was incomplete, plaintiff’s grading and seeding subcontractor could work only in those areas where Winkleman was out of the way. In some of these areas defendant’s supervising inspector approved grades around buildings under which water had ponded. The placing and spreading of topsoil on such grades increased the tendency of water to collect under such buildings. There were several heavy rains during July and August, which accentuated this condition.
76. During June and July medical supplies and equipment were moved into some of the buildings. Early in August the first trainload of wounded men arrived at the hospital. The men were received as patients. By that time the pressure on the senior medical officer from higher authority for completion of the hospital was considerable.
77. The chain of command in the Army placed the Commanding General of the Second Service Command in charge over all. He had authority over the Corps of Engineers within that area, and the Medical Corps as well.
At the hospital the senior medical officer was in command. He had authority over the officers of the Corps of Engineers who were working on the hospital.
78. The senior medical officer (hereinafter referred to as the commanding officer) had been in Utica since early December. He had experienced the cold of the winter. He had had occasion to get over the site in the mud of the spring. *700 He saw floors in some of the buildings rotting because of water standing beneath them. During the summer he found himself hampered by dust and uncompleted facilities, and under constant pressure from higher echelons to get the hospital completed and in operation. The condition of the site outside the buildings had made a marked impression on his mind, and he had discussed the drainage problem with plaintiff’s supervising engineer. From his own observation and without inquiry into technical requirements he had concluded that the drainage system as a whole was inadequate.
79. In August the question of further extensions of time for completion of plaintiff’s work was raised. It came up in such a way that consideration of the time for completion of Group 4 (roads and grading) work was separated from building construction items.
Under the Army chain of command, the contracting officer was required to obtain the approval of the commanding officer of any extension which he deemed proper, or to submit his recommendation to higher authority.
The contracting officer submitted to the commanding officer a proposed extension of plaintiff’s time on Group 4 work. The proposal reached the commanding officer after the first patients had been received into the hospital. The commanding officer declined to approve a further extension of time for plaintiff on Group 4 work, and demanded that the Corps of Engineers terminate plaintiff’s right to proceed, take over and do the work themselves or get someone else to do it, and that the drainage system be overhauled and amplified while they were about it.
80. Plans for modification of the drainage system were prepared accordingly, by the staff of the contracting officer. They were substantially completed by August 20,1943. They increased the capacity of the drainage system, and added culverts, catch basins, and riprap, and called for some additional roads.
The adoption of these plans created a situation whereby the continuation of work by Winkleman and by plaintiff under the original plans would result in extensive duplications and additional costs.
*701 The contracting officer determined that it would be more economical in time and money to place in the hands of one contractor (1) the execution of the modified plans and (2) the completion of the unaffected portions of the work of both Winkleman and plaintiff. He decided to terminate plaintiff and give the work to Winkleman. On August 20,1943, he arranged with Winkleman for the work.
Plaintiff was orally notified accordingly on August 21, 1943. Plaintiff was told to make a survey of the work it had done on Group 4 items, and that payment would be made therefor. At that time the contracting officer had no thought of backcharging plaintiff for the excess of Winkle-man’s costs in completing plaintiff’s Group 4 work.
81. Plaintiff was notified in writing on August 23,1943, to stop work on Group 4 the next day. Thereafter, lawyers for the Corps of Engineers advised the contracting officer that he could not stop the work of one contractor and subsequently let the same work to another contractor at a higher price without charging the terminated contractor with the excess cost. On August 28, 1943, the contracting officer formally notified plaintiff of the termination of Group 4 work under Article 9 of the contract, because of delay by plaintiff in the progress of the work.
82. Under conditions existing at the site on August 23, 1943, the modification of the drainage system, the addition of roads, the surfacing of roads, the placing and spreading of topsoil, and seeding were all part and parcel of completing work on the hospital grounds. From the standpoint of defendant’s bookkeeping, some of the work was required to be done by Winkleman under his grading contract (finding 4), some of the work represented items which would have been done by plaintiff under its Group 4 if that portion of its contract had not been terminated, and some of the work was required by the revised plans, and had not been in the contracts of either plaintiff of Winkleman.
83. Sometime during the last week in August or the first week in September the contracting officer forwarded to *702 Winkleman a letter dated August 24, 1943, which, was in effect the original version of Contract No. W-321-eng-995. It was accepted by Winkleman on September 7, 1943.
This made three subsisting contracts between defendant and Winkleman on the hospital job.
Winkleman’s first contract (No. W-321-eng-750) was the grading contract described in finding 4.
His second contract was No. W-321-eng-945, dated June 28, 1943, calling for excavation, compacted fill, and the construction of culverts and roads relating to the installation of railroad facilities.
84. Letter Contract No. W-321-eng-995 recited that Win-kleman’s “oral bid of August 24,1943 for * * * the completion of the placing of topsoil, seeding, and road surfacing * * * as called for in the plans and specifications * * * of [plaintiff’s] contract” was accepted, at the unit prices listed in the letter. After the listing of certain unit prices and estimated quantities, the letter continued:
In view of the present condition of the work it is recognized that it is impracticable to estimate with any degree of accuracy the total quantity of work to be done nor to determine an equitable price for the work. Accordingly, the prices listed above are tentative. When the progress of the work permits a more accurate determination, the prices and quantities listed herein will be reviewed and definite prices and quantities agreed upon.
This letter will constitute the formal notice to proceed * * *. The work * * * shall be completed not later than 15 September 1943. * * *
85. The evidence does not explain what arrangement was made (if, in fact, there was any separate arrangement) at this time (late August and early September) by defendant with Winkleman for payment for the work required by the modified plans for the drainage system.
86. Winkleman proceeded with the work described in finding 82, scheduling it in the interest of orderly progress and without regard to distinction between work that had been part of plaintiff’s Group 4 and work required by the modified plans.
*703 87. On September 20,1943, a conference took place between the contracting officer and members of his staff, on the one hand, and Winkleman and his superintendent, on the other. The purpose of the conference was to agree upon unit prices to be inserted in a final contract for completing that part of plaintiff’s Group 4 work which defendant had terminated and Winkleman had assumed. The contracting officer considered the unit prices suggested by Winkleman “extremely high” but asked Winkleman to submit them with his justification. Reference was made at the conference to the fact that the final contract, as well as the letter contract, would be subject to renegotiation.
88. At the time of the conference described in the preceding finding, the contracting officer intended to include the work on the revised drainage system in Winkleman’s contract No. 995, making the insertion by change order. Three days later he had changed his mind, and expressed an intention to insert this work in Winkleman’s contract No. 945, by change order. His ultimate disposition, upon which determination was made after October 6, 1943, was to insert the work on the revised drainage system into Winkleman’s contract 945 by supplement instead of by change order, and to retain the number 995 for the final and formal contract with Winkleman for the items which had been in plaintiff’s Group 4.
89. Following is a comparison of the unit prices contained in the contracts of plaintiff and of Winkleman for the items listed.

*704 90.Following is the status of plaintiff’s Group 4 work at the time of its termination (August 24,1943).

91. On the basis of the unit prices in plaintiff’s contract (set forth in finding 89) and the volume of work performed (set forth in the above finding) plaintiff earned, in the performance of Group 4 items, the sum of $42,559.17.
Plaintiff has been paid the amount stated in the preceding paragraph for the performance of Group 4 items.
92. Following is a comparison of the quantities of work remaining to be done in Group 4 of plaintiff’s contract at the time of the termination, and the quantities of work similarly designated which were performed by Winkleman and for which he was paid.

93.On the basis of the unit prices in Winkleman’s contract (set forth in finding 89) and the volume of work performed by him (set forth in the above finding), Winkleman earned the sum of $110,307.50.
*705 The same items, if performed at the unit prices contained in plaintiff’s contract for Group 4 items, would have cost the sum of $42,962.42.
The contracting officer, in making settlement with plaintiff, credited $265.79 for crushed stone on the site, and charged plaintiff the difference of $67,079.29. This action was taken by the contracting officer on May 1, 1944.
94. (a) By letter dated August 30, 1943, plaintiff protested the termination of its Group 4 work on the ground of delay.
(b) On September 12,1943, plaintiff requested extensions of time for all groups of its work. The request relating to Group 4 was for an extension of time to August 24, 1943, the date of the termination of that work.
(c) By change order 55, issued on February 8, 1944, the contracting officer granted extensions of time sufficient to cover the time actually used in completion of Groups 1, 2, and 3 (September and October), but extended the time for Group 4 to July 30,1943, only.
(d) On March 8, 1944, plaintiff appealed the decision of the contracting officer relating to extensions of time to the Secretary of War.
(e) Plaintiff has not challenged the decision of the contracting officer relating to extensions of time as being fraudulent.
95. (a) On May 10,1944, plaintiff protested the action of the contracting officer in backcharging plaintiff for the differences recited in finding 93.
(b) On June 17, 1944, the contracting officer ruled that the Group 4 work was properly terminated and that the backcharge was justified.
(c) On July 15, 1944, plaintiff appealed this decision of the contracting officer to the Secretary of War.
(d) Plaintiff has not challenged the decision of the contracting officer relating to the backcharge as being fraudulent.
96. (a) On September 28,1943, plaintiff forwarded to the contracting officer “a report concerning the operations in connection with the topsoil, seeding and road surfacing work together with our request for findings of fact pursuant to *706 your termination of that portion of the work.” Both the report and the requested findings of fact contained detailed summaries of the situation.
(b) When the contracting officer made no reply to plaintiff’s request for findings of fact, plaintiff renewed the request by letter dated June 14,1944.
(c) The contracting officer’s reply of June 17,1944, is set forth below. This was the response on which plaintiff based its appeal of July 15,1944.
Reference is made to your letter dated 14 June 1944, reiterating previous request by letter dated 28 September 1943, for a findings of fact of the Contracting Officer relative to the termination of Topsoil, Seeding and Road Surfacing Operations under the subject contract.
Subsequent to the “stop order” effective as of 24 August 1943, and issued by letter dated 23 August 1943, the Contracting Officer advised you by letter dated 25 August 1943, that the termination of this portion of work was undertaken after you had failed to prosecute the work with such diligence as to insure completion within the time limitation provided by the contract. Following receipt of your letter dated 28 September 1943, the Contracting Officer reviewed the facts and circumstances relative to the termination with respect to your submitted data and found no cause to warrant a reversal of the action taken. You were further advised by letter dated 22 March 1944, of the amount representing excess cost to the Government through the completion of terminated work by others. This amount was deducted from your contract by Final Payment Estimate No. 13, submitted by letter dated 1 May 1944.
A further review of the termination action has been made following the return of Final Payment Estimate No. 13 containing your exception of the instant claim. You are advised that I consider the termination and assessment of added costs to your organization justified and this notification is intended as my final decision from which any appeal must be taken in accordance with Article 15 of the contract. You are further advised that such appeal, addressed to the Secretary of War, and containing all facts upon which the appeal is based, must be submitted to this office for forwarding within 30 days from mailing date of this notification.
98. Each of plaintiff’s appeals (of March 8,1944, from the issuance of change order 55; and of July 15,1944, concerning *707 the validity of the termination and the justification of the backcharge) was based on a ruling by the contracting officer unaccompanied by findings of fact. Each of plaintiff’s appeals was presented in full detail and supported by documents.
Detailed findings of fact were made by the contracting officer in each instance and presented to higher authority after plaintiff’s appeals had been filed.
The contracting officer’s findings of fact “presented in connection with the appeal dated 15 July 1944 * * *” was “separated into two categories” as follows:
Part I — Justification for terminating contractor’s right to proceed * * *.
Part II — Justification of amount backcharged * * *.
In essence the contracting officer’s findings of fact so “presented” comprised the reply brief of an advocate opposing the advocacy of plaintiff’s appeal.
In the findings of fact so presented the contracting officer asserted (1) that “the actual delays incurred were considered and included * * * in the preparation of Change Order No. 55and (2) that “only work or the completion of such work associated with the terminated work items originally contemplated within the scope of [plaintiff’s] contract was included” in Winkleman’s Contract No. 995.
99. On December 14, 1945, the War Department Board of Contract Appeals denied plaintiff’s appeals of March 8 and July 15,1944.
Plaintiff has not challenged the decision of the Board as being fraudulent.
In its opinion denying the appeals the Board found (1) that “the time extensions granted by Change Orders 37 and 55 represent all the delays in the performance of * * * work on Group IV due to unforeseeable causes beyond the control and without the fault or negligence of the appellant, and that the appellant is not entitled to any further time extensions (2) that “the termination of the contract, insofar as related to Group IV thereof, was legally justified;” and (3) that plaintiff had failed to sustain the burden of proof in support of its contention that the unit prices paid Winldeman *708 were unreasonable and excessive, although, the Board was “impressed with the enormous increase in the unit prices paid Winkleman over those provided in appellant’s contract.”
100. On the basis of the evidence presented at the trial of this action it is fair to conclude:
(a) That the contracting officer decided to terminate plaintiff’s right to proceed with Group 4 work as a matter of convenience to the Government;
(b) That the basic reason for the decision to order such termination was to permit a more orderly and more economical scheduling of the work involved in finishing the hospital grounds, after the commanding officer had demanded revision of the drainage system;
(c) That delay by plaintiff in the progress of Group 4 work was not an important factor in the initial decision to terminate the work, but was made such a factor in the issuance of the formal order of termination only because of advice of counsel to the contracting officer that failure to back-charge excess costs would result in legal complications;
(d) That the contracting officer never made or attempted to make a realistic appraisal of the causes of delay in plaintiff’s progress with Group 4 work on which to base extensions of time for excusable delay;
(e) That the extension of time for Group 4 work from June 30 to July 30, as provided in change order 55, was a device, and not a determination.
101. (a) The quantities set forth in plaintiff’s contract as items for performance in Group 4 were estimated. The variation between such estimated quantities and the quantities actually performed by Winkleman was not greater than the variation reasonably to be anticipated between the estimated quantities listed in plaintiff’s contract and the quantities plaintiff might have been called upon to perform if its Group 4 had not been terminated.
(b) It is not established by the evidence that the unit prices established in contract 995 between defendant and Winkleman were not fair and reasonable prices for the work Winkleman was required to perform.
(c) The work which Winkleman was required to perform under his contract No. 995 was not the same as the work *709 required by plaintiff’s contract in Group 4, although the items were given the same designations.
The items of work so designated, as performed by Winkle-man, were affected (1) by the unknown conditions described in findings 49 (b) and 50, and (2) by the modified design of the drainage system described in finding 80 to such an extent that, if plaintiff had been called upon to perform them, it would have been entitled to review and adjustment of the contract price under Articles 3, 4, and 5 of its contract.
GENERAL PROVISIONS
102. Article 1 of plaintiff’s contract provided:
article i. Statement of work. — The contractor shall furnish all labor and equipment and furnish such materials as clay sewer pipe, cement, sand, gravel, masonry units, and roofing which are not to be furnished by the Area Engineer or the Government (See paragraph 1-06, 1-07, 1-08 and 1-09 of the specifications) and perform all work required in connection with the construction of buildings, utilities, and road surfacing for the U. S. Army General Hospital at Utica, New York, in strict accordance with the attached specifications and drawings forming a part hereof. * * *
The work shall be commenced within five (5) calendar days after December 21, 1942, the date of receipt and acceptance of Letter of Intent dated December 15, 1942, and shall be completed as follows: Warehouses, Telephone and Administration Building — not later than March 1, 1943; Barracks and Headquarters — not later than March 15, 1943; all other buildings and utilities (except roads and grading) — not later than April 15, 1943; Roads and Grading — not later than May 15,1943.
103. Article 3 of the contract follows:
article 3. Changes. — The contracting officer may at any time, by written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim for adjustment under this article must be asserted within 10 days from the date the change is ordered: Provided, however, That the *710 contracting officer, if he determines that the facts justify such action, may receive and consider, and with the approval of the head of the department or his duly authorized representative, adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in article 15 hereof. But nothing provided in this article shall excuse the contractor from proceeding with the prosecution of the work so changed.
104. Article 4 of the contract follows:
aiotcle 4. Changed conditions. — Should the contractor encounter, or the Government discover, during, the progress of the work subsurface and/or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the plans and specifications, the attention of the contracting officer shall be called immediately to such conditions before they are disturbed. The contracting officer shall thereupon promptly investigate the conditions, and if he finds that they do so materially differ the contract shall, with the written approval of the head of the department or his duly authorized representative, be modified to provide for any increase or decrease of cost and/or difference in time resulting from such conditions.
105. Article 5 of the contract follows:
article 5. Extras. — Except as otherwise herein provided, no charge for any extra work or material will be allowed unless the same has been ordered in writing by the contracting officer and the price stated in such order.
106. Article 9 of the contract follows:
article 9. Delays. — Damages.—If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Government may take over the work and prosecute the same to completion, by contract or otherwise, and the contractor and his sureties shall *711 be liable to the Government for any excess cost occasioned the Government thereby. If the contractor’s right to proceed is so terminated, the Government may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work and necessary therefor. If the Government does not terminate the right of the contractor to proceed, the contractor shall continue the work, in which event it will be impossible to determine the actual damages for the delay and in lieu thereof the contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth in the specifications or accompanying papers and the contractor and his sureties shall be liable for the amount thereof: Provided, That the right of the contractor to proceed shall not be terminated under this article or the contractor charged with liquidated damages because of any delays in the completion of the work aue to unforeseeable causes beyond the control and without the fault or negligence of the contractor, including, but not restricted to, acts of God, or the public enemy, acts of the Government (including, but not restricted to any preference, priority or allocation order), acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and unusually severe weather or delays of subcontractors due to such causes, if the contractor shall within 10 days from the beginning of any such delay (unless the contracting officer, with the approval of the head of the department or his duly authorized representative, shall grant a further period of time prior to the date of final settlement of the contract) notify the contracting officer in writing of the causes of delay, who shall ascertain the facts and the extent of the delay and extend the time for completing the work when in his judgment the findings of fact justify such an extension, and his findings of fact thereon shall be final and conclusive on the parties hereto, subject only to appeal, within 30 days, by the contractor to the head of the department concerned or his duly authorized representative, whose decision on such appeal as to the facts of delay and the extension of time for completing the work shall be final and conclusive on the parties hereto.
107. Article 15 of the contract follows:
article 15. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning *712 questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the contracting officer, who shall reduce his decision to writing and mail a copy thereof to the contoactor at his address shown herein. Within 30 days from said mailing the contractor may appeal in writing to the Secretary of War, whose written decision or that of his designated representative or representatives thereon shall be final and conclusive upon the parties hereto. The Secretary of War may, in his discretion, designate an individual, or individuals, other than the contracting officer, or a board as his authorized representative to determine appeals under this article. The contractor shall be afforded an opportunity to be heard and offer evidence in support of his appeal. The president of the board, from time to time, may divide the board into divisions of one or more members and assign members thereto. A majority of the members of the board or of a division thereof shall constitute a quorum for the transaction of the business of the board or of a division, respectively, and the decision of a majority of the members of the board or of a division shall be deemed to be the decision of the board or of a division, as the case may be. If a majority of the members of a division are unable to agree on a decision or if within 30 days after a decision by a division, the board or the_president thereof directs that the decision of the division be reviewed by the board, the decision will be so reviewed, otherwise the decision of a majority of the members of a division shall become the decision of the board. If a majority of the members of the board is unable to agree upon a decision, the president will promptly submit the appeal to the Under Secretary of War for his decision upon the record. A vacancy in the board or in any division thereof shall not impair the powers nor affect the duties of the board or division nor of the remaining members of the board or division, respectively. Any member of the board, or any examiner designated by the president of the board for that purpose, may hold hearings, examine witnesses, receive evidence and report the evidence to the board or to the appropriate division, if the case is pending before a division. Pending decision of a dispute hereunder the contractor shall diligently proceed with the performance of this contract. Any sum or sums allowed to the contractor under the provisions of this article shall be paid by the United States as part of the cost of the articles or work herein *713 contracted for and shall be deemed to be within the contemplation of this contract.
108. Article 23 of the contract follows:
article 23. — Termination for Convenience of the Government. — (a) The Government may terminate this contract in whole or in part at any time by a notice in writing from the contracting officer to the contractor, specifying the date upon which such termination shall become effective and the extent to which the performance of such contract shall be terminated. Termination shall be effective upon the date and to the extent specified in said notice.
(b) Upon receipt of the notice of termination the contractor shall except insofar as the notice directs otherwise with respect to this contract, or, in the event of partial termination, with respect to the part thereof covered by this notice:
(1) Discontinue all work and the placing of all orders for materials and facilities otherwise required for the performance thereof;
(2) Cancel all existing orders and subcontracts to the extent such orders and subcontracts are chargeable to the performance thereof;
(3) Transfer to the Government, in accordance with the directions of the contracting officer, all materials, supplies, work in process, facilities, equipment, machinery or tools acquired by the contractor in connection with the performance thereof, and all plans, drawings, working drawings, sketches, specifications and information for use in connection therewith. If, and as the contracting officer so directs or authorizes, the contractor shall sell at a price approved by the contracting officer, or retain at a price mutually agreeable, any such materials, supplies, equipment, machinery, tools, or other things, provided, however, that the contractor may retain any such equipment, machinery and tools as of right if he so elects in writing, stating that he will forego reimbursement therefor. The proceeds of any such sale, or the agreed price, shall be paid or credited to the Government in such manner as the contracting officer may direct so as to reduce the amount payable by the Government under this article;
(4) Take such action as may be necessary to secure to the Government the benefits of any rights *714 remaining in the contractor, under orders or subcontracts chargeable thereto to the extent that such orders or subcontracts are so chargeable;
(5) Take such action as the contracting officer may prescribe for the protection and preservation of all property in the possession or control of the contractor, title to which is transferable to the Government under the provisions of this article.
Should the notice of termination cover only a portion of this contract, the contractor will proceed to completion of such portions as are not terminated. _
_ (c) Upon compliance by the contractor with the above provisions of this article and subject to deductions or credit for payments previously made, and without duplication of any such payments, the Government shall pay to the contractor such sum as the contracting officer and the contractor may agree by Supplemental Agreement is reasonably necessary to compensate the contractor for his costs, expenditures, liabilities, commitments and work with respect to this contract, other than the expenditures and costs referred to in paragraph (e) of this article. The contracting officer shall include in such sum allowance for profit with respect to the contract as is reasonable under all the circumstances.
(d) If the contracting officer and the contractor, within 90 days from the effective date of the notice of termination referred to in paragraph (a), or within such extended period as may be agreed upon between them, cannot agree upon the sum payable under the provisions of paragraph (c), the Government shall instead compensate the contractor in the following manner, subject to deductions or credit for payments previously made, and without duplication thereof, and upon compliance with the provisions of paragraphs (a) and (b) of this article:
(1) By reimbursing the contractor for all actual expenditures and costs certified by the contracting officer as having been made or incurred with respect to this contract, including expenditures and costs made or incurred in connection with any portions of the contract which may have been completed prior to termination, as well as expenditures and costs made or incurred after termination in completing those portions of the contract which the contractor may have been required by the notice of termination to complete.
(2) By reimbusing or providing for the payment or reimbursement of the contractor for all expendi *715 tures made or costs incurred with the prior written approval of the contracting officer in settling or discharging any outstanding contractual obligations or commitments incurred or entered into by the contractor with respect to this contract; and
(3) By paying the contractor, as a profit on this contract, insofar as a profit is realized hereunder, an amount to be computed by the contracting officer in the following manner:
(A) Estimate the profit which would have been realized on this contract if the contract had been completed and labor and materials costs prevailing at the date of terminations had remained in effect.
(B) Estimate, from a consideration of all relevant factors, the percentage of completion of the contract including any work performed after termination. In estimating the percentage of completion, the contracting officer shall estimate the percentage of the total work required by the contract which the work actually accomplished represents.
(C) Multiply the profit determined under (A) by the percentage determined under (B). The product is the amount to be paid the contractor as profit.
109. The contract provided for unit price payments as follows:

*716 110. Paragraph 1-11 of the General Provisions follows:
1 — 11. Oommertcement, Prosecution, and Completion. — (a) The contractor will be required to commence work under the contract within 5 calendar days after the date of receipt by him of notice to proceed, prosecute the said work with faithfulness and energy, and complete the work in accordance with the construction schedule below:
(1) Warehouses, Telephone and Administration Buildings — not later than March 1, 1943.
(2) Barracks and Headquarters — not later than March 15, 1943.
(3) All other buildings and utilities (except roads and grading) — not later than April 15, 1943.
(4) Boads and Grading — not later than May 15, 1943.
(b) If the completion of the undertaking to be performed under the terms of this contract be delayed by reason of delay in the delivery of materials or supplies essential to such performance because of war priorities and without the fault or negligence of the contractor, the time of performance will be extended for a period equal to such delay, as determined by the contracting officer, and subject to appeal, as provided in Article 9 of the contract.
(c) In case of failure on the part of the contractor to complete the work on or before the dates specified in sub-paragraph 1-11 (a), plus any extensions duly granted under the terms of the contract, liquidated damages will not be assessed, but the contracting officer may terminate the contractor’s right to proceed with the work. (See paragraph 1-13).
(d) The grading of the site, being performed by others, will probably not be complete at the time of commencement of work under this contract. Such non-completion will not be the basis of a claim for more money or more time, and this contractor will be required to work at available locations and not wait until grading is all completed. Work under this contract shall be commenced as required by these specifications.
111. Paragraph 1-20 of the General Provisions follows:
1-20. Damage and Restoration. — -Any damage to Government equipment or property due to failure of the contractor to take reasonable precautions and all loss or deterioration of or damage to the permanent work by accident, fire or exposure resulting from acts of the con *717 tractor shall be made good by the contractor immediately and in any event prior to final acceptance, without expense to the United States. The contractor will also be held responsible for any damage done to adjacent property through his neglect or failure to protect the work properly. Should the contractor neglect or fail to comply with all of these requirements immediately after being notified, the contracting officer may have the order executed and deduct the cost thereof from any payment due or to become due to the contractor or have recourse to the surety under the performance bond. The contractor will not be held responsible for damage sustained by the permanent work from accident, flood, or exposure where such damage is not due to his fault or negligence and where the work is being conducted in accordance with the terms and schedule of the contract, but he shall make such repairs as the contracting officer may direct to such damaged portions of the work as provided for under the terms of the contract.
112. Paragraph 1-21 of the General Provisions follows:
1-21. Local Facilities. — (a) Electric Power. — Electric power is available at Utica, New York. The contractor shall make his own arrangements, without cost to the United States, for any connections to the service and power that he may require.
(b) Highways. New York Highway No. 5 passes approximately 1 mile south of the site of the work. New York Highway No. 31, a concrete highway, extending west from Utica is along the site of the work. The contractor shall provide his own construction roads. He shall make his own investigations of available roads for transportation, of load limits for bridges and roads, and other road conditions affecting transportation of materials and equipment to the site of the work.
(c) Railroads. The New York Central and West Shore Railroads pass through Utica. In addition, a branch of the Delaware, Lackawanna and Western Railroad from Binghamton and the New York, Ontario and Western Railroad extend to Utica. There is an existing spur track and siding from the main line of the West Shore Railroad south of the site of the work. The contractor shall investigate the availability of the siding from the railroad company and shall make all arrangements. with them for their use for the delivery of any materials and equipment to be used on the work.
(d) Contractor’s Responsibility. Failure of the contractor to acquaint himself with all available informa *718 tion and the conditions as stated above will not relieve him of responsibilty for estimating the difficulties in the successful performance and executing of the whole wort.
113. Paragraph 1-22 of the General Provisions follows:
1-22. Physical Data. — (a) Weather Conditions. Meteorological data in the form of average monthly temperature and precipitation have been prepared from the records of the U. S. Weather Bureau Station at Utica, New York. The mean monthly temperatures are based on a period of record of 75 years. The average monthly precipitation is based on the period between 1826 and 1941. Average monthly temperature and precipitation based on these periods are as follows:

(b) Subsurface Data. From investigation by borings and test pits made on the site of the proposed project, it is assumed that the subsurface conditions are approximately as indicated on foundation drawings, but the nature and suitability of materials, depth to satisfactory foundation, and the moisture content of materials as noted in Eecord of Foundation Exploration are not guaranteed. Soil samples taken at the site of the work are in storage at the Ü. S. Engineer Soils Laboratory, Tower Eoad, Ithaca, New York, and are available for inspection.
(c) Responsibility. These data, samples of materials, and logs shown on foundation drawings represent all the pertinent information available on weather conditions and subsurface exploration. It is expressly understood that the United States will not be responsible for any deduction, interpretation, or conclusion made by the contractor from the information noted above.
*719 114. Paragraph. 1-24 of the General Provisions follows:
1-24. Work Areas. — The lands, easements, and rights-of-way necessary for access to the site and for the prosecution of the required work at the site will be furnished by the Government. The contractor shall, at his own expense, and at any time during progress of the work, when needed for other purposes, promptly vacate and clean up any part of the grounds that have been allotted to, or have been in use by him, when directed to do so by the contracting officer.
115. Paragraph 1-43 of the General Provisions follows:
1-43. Uwwatering Work Areas. — Unless otherwise specifically authorized, all permanent structures shall be constructed “in the dry.” For this purpose, the contractor shall provide such diversion channels, drains (including drain tile and french drains), flumes, or other temporary structures, and such pumps and other equipment as may be necessary for unwatering foundations and work areas. Such structures shall be subject to the approval of the contracting officer, but such approval will not relieve the contractor of responsibility for the adequacy of the work. All such temporary structures shall be removed from the site in accordance with paragraph 1-45. Separate payment will not be made for diversion, pumping and providing and removing any temporary protective works and equipment specified above, but the cost thereof shall be included in the contract unit prices for the various items of the permanent work.
116. Paragraph 62-01 of the specifications follows:
62-01. Topsoil. — (a) Scope. Grading the various areas to be topsoiled and seeded is included in a separate contract. Before any topsoil is placed, this contractor shall carefully check the elevations and where necessary restore the existing ground surface to the lines and grades required to receive the topsoil, as indicated on the contract drawings.
(b) General. Topsoil shall consist of selected humus and fibrous material as approved by the contracting officer. No brush, roots, or other unsuitable materials, as determined by the contracting officer, shall be included in the topsoil. Top§oil shall be placed on the embankments and at other locations, all as shown on contract drawings or required by the contracting officer. *720 Topsoil will not be required upon undisturbed original ground surfaces or under buildings and walks.
(c) Source of Materials. Topsoil shall be obtained from existing stockpiles indicated on the contract drawings and from required excavations and borrow areas as directed. Topsoil from excavations and borrow areas is to be stockpiled for future use as directed. When the entire quantity of topsoil from excavations, borrow areas, and stockpiles is placed, the contractor shall furnish from other sources, such quantities of approved topsoil as may be required to complete the work as directed by the contracting officer.
(d) Placing. Topsoil shall be placed and compacted to the depths and limit lines shown on the contract drawings. The topsoil shall be compacted by hand-operated, cylindrical rollers or any other method approved by the contracting officer. Any unevenness of the surface shall be corrected to present a neat and sightly appearance. The subgrade shall be scarified prior to placing topsoil when directed by the contracting officer.
(e) Measurement. Topsoil will be measured by the square (100 sq. ft.) compacted within the limit lines shown on the contract drawings or established by the contracting officer.
(f) Payment. Payment for all costs in connection with placing topsoil obtained from required excavations and borrow areas, and existing stockpiles, including re-handling and rehauling as required or directed, will be made at the contract unit price for “Topsoil — Placing,” Item No. 53a. In the event the contractor is required to furnish topsoil from sources other than required excavations and borrow areas, payment will be made for all topsoil so furnished and placed at the contract unit price for “Topsoil — Furnishing and Placing,” Item No. 53&. No separate payment will be made for restoring the existing ground surface to the elevations required to receive the topsoil but all costs thereof shall be included in the above unit prices.
117. Paragraph 62-02 of the specifications follows:
62-02. Seeding. — (a) Generad. Seeding shall consist of the preparation of the seed bed, furnishing and sowing the seed, and maintenance of seeded areas shown on the contract drawings or directed by the contracting officer. In general seeding will be required on the fills, backfilled areas adjacent to walls, and at the other locations, all as indicated on the contract drawings or di *721 rected by the contracting officer. Seeding shall be done at a suitable time to be determined by the contracting officer. * * *
118. Paragraph 67-01 of the specifications follows:
67-01. Scope of Worh. — The work covered by this section consists of furnishing plant, labor, equipment and materials for surfacing roads, driveways and parking areas as indicated on the contract drawings, as hereinafter specified or as directed by the contracting officer. Grading and the construction of 12-inch foundation courses of run-of-bank gravel for all roads, except roads around heating plants, will not be included in this contract. Before constructing any pavement or shoulders, the contractor will be required to check the elevation of existing gravel foundations and shoulders and restore them to the elevations required to receive the pavement or shoulders as indicated on the contract drawings. Compacted fill complete with a 12-inch foundation course of run-of-bank gravel and French drains for roads and parking areas around heating plants and payment for same shall be as specified in Section LIX.
119. Paragraph 67-02 of the specifications follows:
67-02. Description. — The pavement shall consist of a penetrated base course and a wearing surface of the premixed type. The base course, approximately 3% inches thick, composed of coarse and fine aggregate, shall be laid on the restored foundation course previously constructed by others, in conformity with the lines, grades and cross sections as shown on the contract drawings or as directed by the contracting officer. The wearing surface shall consist of a course iy2 inches thick, placed in one layer, composed of a compacted mixture of coarse and fine mineral aggregate and bituminous material pre-mixed and laid hot on the base course described above. The shoulders shall be constructed of run-of-bank gravel to the depth and width as indicated on the contract drawings. All work shall be done in conformity with the lines, grades and cross section as shown on the contract drawings, and method of laying, preparing, mixing, rolling, etc., shall conform to the requirements as hereinafter specified or directed by the contracting officer.
120. Paragraph 67-03 of the specifications follows:
67-03. Preparation of Existing Fowndation Course. — The existing 12-inch run-of-bank gravel foun *722 dation course previously constructed bv others, shall be repaired, reshaped and necessary suitable material added to restore it to the finished grade and cross section as shown on the contract drawing.
121. Paragraph 67-06 of the specifications follows:
67-06. Shoulders. — (a) General. The shoulders for Type “A” roads shall be constructed of 5 inches of run-of-bank gravel to the widths and grades as shown on the contract drawings. The existing foundation course previously constructed by others, shall be restored as specified in Paragraph 67-03.
(b) Material and Placing. All run-of-bank gravel shall be hard, durable stone and well graded. No gravel shall be placed until culverts and drains are completed and proper drainage provided and foundation course prepared to the satisfaction of the contracting officer. After the existing foundation course has been properly prepared (see paragraph 67-03), the run-of-bank gravel shall be deposited and spread for the full width in a uniform layer and without segregation of size to such loose depth that when compacted the course will have the required thickness.
(c) Uompactmg. Immediately after placing the run-of-bank gravel, the shoulders shall be firmly compacted with an approved roller weighing not less than ten (10) tons, trimmed and inside edges cut to neat lines prior to the placing of the material for the base course or pavement. This work will not be considered as final completion of the shoulders and they shall be satisfactorily completed after the pavement is placed.
122. Paragraph 67-07 of the specifications follows:
67-07. Description. — The pavement shall consist of a run-of-bank gravel base course and a wearing surface of the bituminous double treatment type. The base course composed of approximately 3 inches of run-of-bank gravel shall be placed on the restored foundation course previously constructed by others, in conformity with the lines, grades and cross-section as shown on the contract drawing or as directed by the contracting officer. The wearing surface shall be constructed by the double surface treatment method. Shoulders shall be constructed of run-of-bank gravel to the depth and width as indicated on the contract drawings. All work shall be done in conformity with the lines, grades, and *723 cross-section as shown on the contract drawing and method of laying, preparing, mixing, rolling, etc., shall conform to the requirements as hereinbefore or hereinafter specified or directed by the contracting officer.
123. Paragraph 67-11 of the specifications follows:
67-11. Shoulders. — (a) General. The shoulders for Type “B” roads, driveways and parking areas shall be constructed of 3 inches of run-of-bank gravel to the widths and grades as shown on the contract drawings. The existing foundation course, previously constructed by others, shall be restored as specified in paragraph 67-03.
124. Paragraph 67-14 of the specifications follows:
67-14. Payment. — (a) Pavements of Type “A” Roads and Type “Z>” Roads, Driveways a/nd Parking Areas. Payment for all costs of furnishing plant, labor, equipment and materials required to construct pavements for Type “A” roads and Type “B” roads, driveways and parking areas, will be made at the applicable contract unit price for “Furnishing and Placing Pavement Complete,” Item 93. Such payment shall include all costs of restoring existing foundation course, all spreading, rolling, mixing and grading required to satisfactorily complete the pavement. * * *
(c) Shoulders for Type “A” Roads and Type “B” Roads, Driveways and Parking Areas. Payment for all costs of furnishing plant, labor, equipment, and materials required to construct the R. O. B. gravel shoulders for Type “A” and Type “B” — roads, driveways and parking areas, will be made at the applicable contract unit price for “Furnishing and Placing Gravel Shoulders,” Item No. 92. Such contract unit price shall include all costs of restoring existing foundation course, spreading, grading and rolling.
coNcntrsiON of law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States three hundred seventy-seven thousand seventy-nine dollars and twenty-nine cents ($377,079.29).

 Following is the meteorological data for the winter months as set forth in the construction contract:

 Paragraph 1-11 (c) of the General Provisions. See finding 110.

 Article 9. See finding 106. Of. Article 23, finding 108.

 Paragraph 1 — 11 (d). See finding 110 for the provisions in full context.

 Paragraph 1-21 (b). See finding 112.

 The contracting officer’s belief that the maintenance of the roads (including, of course, their drainage)' was plaintiff’s responsibility has been noted in finding 27. Plaintiff believed, just as firmly, that defendant was bound by the contract to provide adequate roads (including their drainage) as part of the construction site. Plaintiff’s “theory of the case” consequently began and has been consistently maintained as a breach of contract by defendant in failing and refusing to provide roads and drainage, or to pay plaintiff for the expense Incurred by it as a result (1)> of not having the roads and drains during construction and (2) of having to rebuild the roads and drains so the roads could be surfaced. Of. findings 41 and 48, concerning the place in the claim of changed conditions under Article 4 of the contract.

 The average for the month of March was only 2.87 inches.

 See finding 28 and footnote 5.

 Fine earthy sediment carried and deposited by water.

 In fact, April 1943 was both wet and cloudy. There was little opportunity for the soil to dry by evaporation.

 See finding 27.

 See finding 104 for text.

 The dollar amounts have been omitted.

 As heretofore noted, the contracting officer (1) had a preconceived notion that plaintiff had underbid the job (finding 12) and (2) held the belief that maintenance, during the spring thaw, was plaintiff’s responsibility (finding 270. He was never impressed with the extent of the difficulty plaintiff had encountered, except insofar as it resulted in delaying completion of the project.

 See finding 23.

 In as much as the contracting officer denied plaintiff’s claim, he made no findings as to the extra costs incurred. The parties took cognizance of this situation when they were before the Board of Contract Appeals, whose decision said: “* * * no evidence was submitted as to the actual amounts embraced in the various items of the claim, it being stipulated by the parties at the hearing before the Board that should the Board determine the appellant is entitled to recovery upon any item of its claim, that the file be returned to the contracting officer for a determination of the amount, and that the appellant be accorded the right to appeal from that determination.”

 This finding is at variance with the conclusion of the War Department Board of Contract Appeals. It found that the work was made necessary by plaintiff’s abuse of the road bases during the spring thaw. The Board denied plaintiff’s claim on this item.

 This finding is at variance with the conclusion of the Board of Contract Appeals. It found that the work was made necessary by plaintiff’s abuse of the road bases and neglect of the drainage system. The Board denied plaintiff’s claim on this item.

 This finding is at variance with the conclusion of the Board of Contract Appeals. It found that the work was made necessary by plaintiff’s abuse of the road bases and neglect of the drainage system. The Board denied plaintiff’s claim on this item.

 This Item of plaintiff’s claim was dismissed by the Board of Contract Appeals. It made no finding with respect to it, concluding only that the claim Involved unliquidated damages for an alleged breach of contract, and as such was a matter not within the Board’s Jurisdiction. The same is true of thj items described in findings 65 through 69.

 The total of the sums listed in subparagraphs (b) and (c) is $310,000.00.